COORS PORCELAIN COMPANY, PETITIONER *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 1169–68.    Filed July 28, 1969.

*Gene W. Reardon,* for the petitioner.
*Richard J. Shipley,* for the respondent.

686

688

**OPINION**

*Issue 1.  Claimed Obsolescence Loss on Fuel Elements Building*

The first issue for our consideration is whether petitioner is entitled to deduct $223,225.42 as an extraordinary obsolescence loss with respect to the fuel elements building in the taxable year ended January 3, 1965.

Unfortunately the term "obsolescence" is nowhere defined in the Internal Revenue Code or the regulations promulgated thereunder. The decided cases do not contain any comprehensive definition. At best, they merely define the term by examples. See *Real Estate-Land Title & Trust Co.* v. *United States*, 309 U.S. 13 (1940). Thus, some confusion has resulted because obsolescence has been considered the subject of two different sections of the Code: Section 165 relating to "Losses," and section 167 relating to "Depreciation." Compare *Keller Street Development Co.* v. *Commissioner*, 323 F.2d 166 (C.A. 9, 1963), with *Keller Street Development Co.*, 37 T.C. 559 (1961).

"Obsolescence" as defined in Webster's Third International Dictionary is:

1a: the process of becoming obsolete; * * * 2: a factor included in depreciation to cover decline in value of fixed assets due to invention of new and better processes or machines, changes in demand, in design, or in the art, and other technical or legal changes but not to cover physical deterioration.

And obsolete means no longer active or in use, useless. See *Yough Brewing Co.*, 4 B.T.A. 612, 618 (1926).

The Federal tax law recognizes two separate categories of obsolescence: (1) *"Normal"* obsolescence or the gradual loss of usefulness due to the normal progress of the arts, invention, technological improvements, changing economic conditions, and legislation; and (2) *"extraordinary"* obsolescence or the sudden loss of usefulness caused by some unexpected and unforeseen external force.

It is well settled in this Court that "an obsolescence deduction [under section 167] may be availed of only when property becomes useless over a period greater than one year." *Keller Street Development Co.*, *supra* at 567; *W. B. Davis & Son, Inc.*, 5 T.C. 1195 (1945); *Olean Times-Herald Corporation*, 37 B.T.A. 922 (1938); *Tennessee Fibre Co.*, 15 B.T.A. 133 (1929); *William Zakon*, 7 B.T.A. 687 (1927); and see generally 4 Mertens, Law of Federal Income Taxation, sec. 23.104. It is likewise settled that a loss resulting from the sudden termination within 1 year of the usefulness of property used in a trade or business is deductible under section 165 and not section 167, even if the cause of such sudden termination of usefulness is extraordinary obsolescence. *William Zakon, supra* at 690. Although this position was rejected by the Court of Appeals for the Ninth Circuit in *Keller Street Development Co.* v. *Commissioner, supra*, and criticized by the First Circuit in *Zwetchkenbaum* v. *Commissioner*, 326 F.2d 477 (C.A. 1, 1964), affirming a Memorandum Opinion of this Court, it has been contained in the Treasury regulations since 1918.

Since the statutory provisions permitting deductions for losses and for depreciation (including an allowance for obsolescence) have remained substantially unchanged from 1918 until the present, we think an examination of the long-standing administrative regulations, which were contemporaneously promulgated under these sections, is helpful in determining whether the deductibility of a loss resulting from the sudden termination of the usefulness of depreciable property is governed by the loss provisions of section 165 or by the depreciation provisions of section 167.

The regulations under the loss (not the depreciation) provision of the Revenue Act of 1918[1] included a section entitled *"Extraordinary obsolescence,"* which provided, in pertinent part, as follows:

---

[1] Sec. 214. (a)  That in computing net income there shall be allowed as deductions:

\*  \*  \*  \*  \*  \*  \*

(4) Losses sustained during the taxable year and not compensated for by insurance or otherwise, if incurred in trade or business;

\*  \*  \*  \*  \*  \*  \*

(8) A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence;

When through some change in business conditions the usefulness in the business of some or all of the capital assets is *suddenly* terminated, so that the taxpayer discontinues the business or discards such assets permanently for use in the business, he may claim * * * a loss for the year in which he takes such action * * *. This exception to the rule requiring a sale or other disposition of property in order to establish a loss requires proof of some unforeseen cause by reason of which the property must be prematurely discarded, as, for example, where machinery or other property must be replaced by a new invention, or where an increase in the cost of or other change in the manufacture of any product makes it necessary to abandon such manufacture, in which special machinery is exclusively devoted, or where new legislation directly or indirectly makes the continued profitable use of the property impossible. This exception does not extend to a case where the useful life of property terminates solely as a result of these gradual processes *for which depreciation allowances are authorized.* * * * [Art. 143, Regs. 45 (1918). Emphasis added.]

These provisions of the regulation indicate that the deductibility of losses resulting from causes, which we would today characterize as extraordinary obsolescence, was to be governed under the loss rules of the law and not under the depreciation rules.

In 1920, article 143, Regs. 45, was redesignated "Loss of useful value" rather than "Extraordinary obsolescence." Except for this minor change, the regulation remained substantially unchanged until 1936. See art. 143, Regs. 62 (1922), Regs. 65 (1924), Regs. 69 (1926); art. 173, Regs. 74 (1931), Regs. 77 (1933); and art. 23(e)–3, Regs. 86 (1935).

The regulations under the Revenue Act of 1936 were amended and the following provision was added:

In cases in which depreciable property is disposed of due to causes other than exhaustion, wear and tear, and normal obsolescence, such as casualty, *obsolescence other than normal,* or sale, a deduction for the difference between the basis of the property * * * and its salvage value and/or amount realized upon its disposition may be allowed *subject to the limitations provided in the Act upon deductions for losses,* but only if it is clearly evident that such disposition was not contemplated in the rate of depreciation. [Art. 23(e)–3, Regs. 94 (1936).[2] Emphasis added.]

The distinction between normal and abnormal or extraordinary obsolescence is clearly discernible from this amendment. Normal obsolescence is a factor to be taken into consideration in determining the deduction for depreciation under the depreciation rules. In other words, the allowance for normal obsolescence is for capital losses which take place over a period of time greater than a single taxable year. But any loss resulting from the sudden termination of the usefulness of depreciable property, caused by abnormal or extraordinary obsolescence, is deductible "subject to the limitations provided in the

[2] In the Revenue Act of 1934, sec. 214(a) (4) became sec. 23(e).

Act upon deductions for losses." This amendment made explicit what was implicit in the prior regulations.

Since this particular provision was in effect from 1936 until 1960,[3] and since the underlying statutory provision was repeatedly reenacted during such period in substantially the same form, the regulation may be considered to have assumed the force of law. See art. 23(e)-3, Regs. 101 (1939); sec. 19.23(e)-3, Regs. 103 (1940); sec. 29.23(e)-3, Regs. 111 (1943); sec. 39.23(e)-3(c), Regs. 118 (1953).

The first provision in the regulations to specifically deal with obsolescence under the depreciation rules of the law was article 166, Regs. 62 (1922), which provided that—

Inasmuch as under the provisions of the income tax acts in effect prior to the Revenue Act of 1918 deductions for obsolescence of property were not allowed except as a loss for the year in which the property was sold or permanently abandoned, a taxpayer may for 1918 and subsequent years revise the estimate of the useful life of any property so as to allow for such future (not past) obsolescence as may be expected from experience to result from the *normal progress of the art*. [Emphasis added.]

From 1924 until 1956, the regulations under the depreciation section contained the following provision:[4]

With respect to physical property the whole or any portion of which is clearly shown by the taxpayer as being affected by economic conditions that will result in its being abandoned *at a future date* prior to the end of its normal useful life, so that depreciation deductions alone are insufficient to return the cost or other basis at the end of its economic term of usefulness, a reasonable deduction for obsolescence, *in addition to depreciation*, may be allowed in accordance with the facts obtaining with respect to each item of property concerning which a claim for obsolescence is made * * * [Emphasis added.]

By its reference to abandonment "at a future date" and to the fact that the allowance for obsolescence is "in addition to depreciation," [5] article 166 provided that the allowance for obsolescence under the depreciation provision of the law is for the gradual decrease in value caused by *normal* obsolescence occurring over a period greater than 1 year. Cf. *Keller Street Development Co., supra* at 567. It is fundamental that these regulations, as contemporaneous constructions by those charged with the administration of the tax laws, are entitled to great weight. Cf. *Bingler* v. *Johnson*, 394 U.S. 741 (1969).

The regulations under section 165 were not adopted until 1960.

---

[3] Since the regulations under sec. 165, I.R.C. 1954, were not promulgated until 1960, sec. 39.23(e)-3(c), Regs. 118 (1953) continued in effect until that time. Sec. 7807, I.R.C. 1954. Cf. *G. F. Hedges, Jr.*, 41 T.C. 695 (1964).

[4] See art. 166, Regs. 65 (1924), Regs. 69 (1926); art. 206, Regs. 74 (1931), Regs. 77 (1933); art. 23(1)-6, Regs. 86 (1935), Regs. 94 (1936), Regs. 101 (1939); sec. 19.23(1)-6, Regs. 103 (1940); sec. 29.23(1)-6, Regs. 111 (1943); sec. 39.23(1)-6, Regs. 118 (1953).

[5] Significantly, the allowance for depreciation is for capital losses from exhaustion, wear, and tear occurring over a period greater than a single taxable year.

Section 1.165–2, proposed July 3, 1956, withdrawn and reproposed October 8, 1959, finally adopted January 15, 1960, by T.D. 6445, provides:

(b) *Exceptions.*—This section does not apply to * * * losses sustained upon the obsolescence of depreciable property. * * *

(c) *Cross references.*—For the allowance *under section 165(a)* of losses arising from the permanent withdrawal of depreciable property from use in the trade or business * * * see § 1.167(a)–8. For provisions respecting the obsolescence of depreciable property, see § 1.167(a)–9. * * * [Emphasis added.]

Section 1.167(a)–9, as amended by T.D. 6445, filed January 15, 1960, provides: "For rules governing the allowance of a loss when the usefulness of depreciable property is suddenly terminated, see § 1.167(a)–8." [6]

We conclude from this legislative and administrative history (1) that normal obsolescence has been long recognized in the tax law as a factor to be considered in the determination of useful life for purposes of depreciation,[7] and (2) that extraordinary obsolescence results either in the shortening of previously determined useful life,[8] or in a loss if the useful life is completely and suddenly terminated.[9]

In our opinion the 1960 amendments to the regulations continued in force the rule that "if the usefulness of property terminates suddenly in one year, the loss may be fully deductible under section 165, but not under section 167," 4 Mertens, Law of Federal Income Taxation, sec. 23.105 fn. 32. Therefore, while the appropriate statutory provision for the allowance of a deduction for an extraordinary obsolescence loss of depreciable property occurring within 1 year is section 165(a), the pertinent regulation is section 1.167(a)–8. See sec. 1.165–2(c), Income Tax Regs. Practically speaking, section 1.167(a)–8 provides the *exclusive* rules governing the allowance for loss resulting from the sudden termination of the usefulness of depreciable property, and petitioner does not claim otherwise. Secs. 1.165–2(c) and 1.167(a)–9, Income Tax Regs.

Here the petitioner argues that the fuel elements building sustained an extraordinary obsolescence loss of $223,225.42 in the taxable year

---

[6] Under the 1956 regulations, this provision read: "For rules governing the allowance of a loss when the usefulness of an asset is suddenly terminated, *see section 165 and the regulations thereunder.*" [Emphasis added.]

[7] See sec. 167, I.R.C. 1954; sec. 23(l), I.R.C. 1939; sec. 23(l), Revenue Acts of 1938, 1936, 1934; sec. 23(k), Rev. Acts of 1932, 1928; secs. 214(a)(8) and 234(a)(7), Rev. Acts of 1926, 1924, 1921, 1918.

[8] See sec. 1.167(a)–9, Income Tax Regs., which provides:
In any case in which the taxpayer shows that the estimated useful life previously used should be shortened by reason of obsolescence greater than had been assumed in the computing of such estimated useful life, a change to a new and shorter estimated useful life computed in accordance with such showing will be permitted * * *

[9] See sec. 1.167(a)–9, Income Tax Regs., which provides:
For rules governing the allowance of a loss when the usefulness of depreciable property is suddenly terminated, see § 1.167(a)–8. * * * See also sec. 1.165–2(c) and sec. 165(a).

1964 as a result of the cancellation of the AEC contract. In support of this argument, petitioner stresses that the fuel elements building was a single-purpose facility, useful solely for the production of nuclear fuel elements, that the unexpected cancellation of the contract to produce such fuel elements caused the building to become "economically useless" in its ceramic operations, and that its use of "a very small part" of the building on a "temporary" basis constitutes no more than an attempt to salvage some use of the building. Respondent counters with the contention that the "continued use of the building, both actual and contemplated precludes any obsolescence deduction."

Section 1.167(a)–8, Income Tax Regs., provides, in pertinent part, that:

For the purposes of this section the term "retirement" *means the permanent withdrawal of depreciable property* from use in the trade or business * * * . The withdrawal may be made in one of several ways. * * * [T]he asset may be withdrawn from such productive use without disposition as, for example, by being placed in a supplies or scrap account. * * * Upon the retirement of assets, the rules in this section apply in determining whether gain or loss will be recognized, the amount of such gain or loss, and the basis for determining gain or loss:

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(3) Where an asset is permanently retired from use in the trade or business * * * but is not disposed of by the taxpayer or physically abandoned * * *. [L]oss will be recognized * * * only if—

(1) the retirement is an abnormal retirement, * * *

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

(b) *Definition of normal and abnormal retirements.* * * * a retirement may be abnormal if the asset is withdrawn at an earlier time or under other circumstances, as, for example, when the asset has * * * lost its usefulness suddenly as the result of *extraordinary obsolescence.*

[Emphasis added.]

As we read this particular section of the regulations, in order for petitioner to establish a recognizable loss under the circumstances herein, it must show (1) that the fuel elements building's usefulness suddenly terminated in the taxable year 1964 and (2) that the building was permanently withdrawn from use.

We conclude on this record that petitioner has failed to establish either of these facts. There is no evidence that the building was permanently withdrawn from use in petitioner's trade or business during the year in issue. Instead of disclosing the withdrawal of the building from use, the evidence shows continued and consistent use until the date this case was tried—some 5 years after its usefulness was supposed to have *suddenly* terminated. Such continued use conflicts with the contention that the building's economic usefulness terminated as of January 3, 1965. In addition, it is clear from the testimony of petitioner's officers that even as late as January 28, 1969, efforts were

being made to find another use for the building. This further indicates that the building was neither useless as far as petitioner was concerned nor withdrawn from use in the taxable year 1964.

Respondent acknowledges "that the greatest value to petitioner of its building was for fuel element production." Nevertheless, he argues that "the mere diminution in value while the assets are still used is not a proper basis for obsolescence deduction." *Detroit & Windsor Ferry Co.* v. *Woodworth*, 115 F.2d 795, 798 (C.A. 6, 1940).

Even if certain special features of the building became obsolete and were withdrawn from use by petitioner in the taxable year 1964, it is plain that the building *as a whole* was not obsolete and, more important, it was not permanently withdrawn from use. Petitioner made no effort to segregate and identify the undepreciated cost of these features or to claim a deduction for them. Consequently, we cannot allow, on this record, any deduction of obsolescence of these specialized features because of petitioner's failure to offer any evidence of their undepreciated cost. See *Blackford Window Glass Co.*, 13 B.T.A. 1268 (1928); *H. K. Gardiner*, 7 B.T.A. 1089 (1927).

In an apparent attempt to circumvent the permanent withdrawal provision of the regulations, petitioner contends that its continued use of "a very small part" of the building was temporary and unsatisfactory and constituted no more than an effort to increase the amount of salvage. The difficulty with this contention, aside from its lack of any factual foundation in the record, is that it assumes that petitioner was attempting only to realize salvage—an assumption with which we do not agree.

Petitioner's continued use of the building for other purposes for 5 years after it terminated production of the fuel elements belies the contention that the building is "a single purpose building," and that such use was merely temporary. When petitioner moved its research and spectrochemical departments into the building, its officers had "hoped it would work out." This supports the inference that these officers, in the exercise of their best business judgment, thought the building would be suitable for such purpose. The record is void of evidence showing that petitioner, as of the close of the taxable year 1964, had reached the conclusion that the building was inadequate for its need in this respect. While subsequent events may have disclosed that the building had become useless to petitioner for such purpose, we cannot determine obsolescence in the taxable year from what happened later. See *Yough Brewing Co.*, 4 B.T.A. 613 (1926).

Petitioner's reliance on *Burnet* v. *Niagra Falls Brewing Co.*, 282 U.S. 648 (1931), is misplaced. It is clearly distinguishable. In that case "the evidence conclusively showed a definitely contemplated abandonment, substantially consummated during the taxable period." *Detroit*

& *Windsor Ferry Co.* v. *Woodworth, supra* at 798. That is not the situation here. Petitioner has not shown that it even contemplated abandoning the building in the taxable year before us, or at any time in the foreseeable future. Cf. *James D. Dunn*, 42 T.C. 490, 495 (1964) ; *Radio Station WBIR, Inc.*, 31 T.C. 803 (1959).

Accordingly, we hold in these circumstances that petitioner is not entitled to deduct $223,225.42 as an extraordinary obsolescence loss on the ground that the building was not "permanently retired from use in the trade or business" in the taxable year 1964 as required by section 1.167(a)–8, Income Tax Regs.

## Issue 2. Useful Life of Fuel Elements Building

The second issue we must consider is whether the useful life of the fuel elements building for depreciation purposes is 20 years, as petitioner claims, or 40 years, as respondent has determined.

Petitioner takes the position that the 20-year useful life for the building was reasonable and should be approved because it was the product of negotiations with the AEC and was consistently used in the determination of its depreciation deduction in prior years. Respondent, to the contrary, contends that the contract cancellation, by forcing a change in the use of the building rather than cutting short its useful life, extended it to a period comparable to that of petitioner's other similarly constructed buildings, i.e., 40 years. Respondent's determination is, of course, presumptively correct and the burden of proving it incorrect falls upon the petitioner. *Welch* v. *Helvering*, 290 U.S. 11 (1933). The only evidence offered by petitioner was the uncorroborated testimony of its officers which we find unconvincing. Hence, we think petitioner has not sustained its burden of proving respondent's determination erroneous.

Section 1.167(a)–1(b) provides, in pertinent part, as follows:

For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business * * *. *This period shall be determined by reference to his experience with similar property* taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. * * * The estimated remaining useful life may be subject to modification by reason of conditions known at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation. [Emphasis added.]

Admittedly, the estimated useful life of 20 years was reasonable at the time it was initially determined since it was the result of a negotiated agreement between the petitioner and the AEC and was based on the intended special use of the building for the production of nuclear fuel elements. But the basis underlying such estimate of useful life was significantly changed during the taxable year 1964 when the building was put to an entirely different use. Such change in circumstances makes appropriate the reconsideration of the reasonableness of the initial estimate of useful life for depreciation purposes.

As indicated by section 1.167(a)-1(b), Income Tax Regs., the taxpayer's experience with similar property is an important factor to be considered in determining estimated useful life. Petitioner's experience with other buildings of similar construction, as disclosed by its depreciation schedule for such buildings, shows that an estimated useful life of 40 years is not unreasonable in light of the conditions existing as of January 3, 1965. Petitioner is depreciating its other brick or concrete buildings over useful lives of 40 or 50 years and, in actuality, these buildings are being kept in use even longer. Accordingly, we sustain respondent on this issue.

*Issue 3. Treatment of Amounts Expended on Equipment Items*

The third issue is whether the amounts spent for alteration and changes in the besly grinder and for the development of a position loader and an X-Y positioner are deductible as business expenses or constitute nondeductible capital expenditures.

During the taxable year 1964 the petitioner spent $5,655.80 to change the motion of its besly grinder from oscillating to a rotary feed-wheel motion, $2,292.25 in developing a position loader, and $477.24 in developing an X-Y positioner. On its Federal income tax return for that year, petitioner deducted each of these items as business expenses. Respondent disallowed all of the amounts as nondeductible capital expenditures.

Petitioner maintains that the amounts expended for the modification of the besly grinder are deductible either as expenses for repairs or as experimental expenditures. Respondent takes the position that the expenditures resulted in adapting the grinder "to a new and different use," or in a permanent improvement, the cost of which constitutes a capital expenditure under section 263(a).[10] We agree with the respondent.

[10] SEC. 263. CAPITAL EXPENDITURES

(a) GENERAL RULE.—No deduction shall be allowed for—

(1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. This paragraph shall not apply to--

\* \* \* \* \* \* \*

(B) research and experimental expenditures deductible under section 174, \* \* \*

Petitioner's contention that the expenditures were for the purpose of repairing the grinder is without merit. "To repair is to restore to a sound state or to mend." *Illinois Merchants Trust Co.*, 4 B.T.A. 103, 106 (1928). There is not the slightest appearance of any "mending" or "restoring [the grinder] to a sound state." Instead of repairing the grinder, the petitioner altered or improved it to function in a different manner. We think the expenditures were for a permanent improvement or betterment made to increase the value of the grinder; thus, they constitute capital expenditures under section 263(a). See *Difco Laboratories, Inc.*, 10 T.C. 660, 669 (1948).

Equally without merit is petitioner's contention that the expenditures are deductible as experimental expenditures. The only authority cited in support of this contention is *Kent Machine Co.* v. *Commissioner*, 168 F.2d 68 (C.A. 6, 1948), affirming a Memorandum Opinion of this Court, which is distinguishable on its facts. However, section 174(a)[11] provides that under certain circumstances a taxpayer may treat experimental expenditures as deductible expenses.

Significantly, section 263(a) is expressly made inapplicable by its own terms to experimental expenditures deductible under section 174. See sec. 263(a)(1)(B).

On the evidence presented we hold that petitioner has not established its right to treat the expenditures for the besly grinder modification as deductible expenses under section 174(a) for two reasons. First, there is no evidence that the expenditures in question constitute "experimental expenditures" within the meaning of section 174(a). See section 1.174–2, Income Tax Regs., for the general definition of research and experimental expenditures. Aside from petitioner's naked allegation that the expenditures were for experimentation, the record is silent on this point. To be sure, some part of the expenditures constituted costs of the component material of the modification, the cost

---

[11] SEC. 174. RESEARCH AND EXPERIMENTAL EXPENDITURES.

(a) TREATMENT AS EXPENSES.—

(1) IN GENERAL.—A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction.

(2) WHEN METHOD MAY BE ADOPTED.—

(A) WITHOUT CONSENT.—A taxpayer may, without the consent of the Secretary or his delegate, adopt the method provided in this subsection for his first taxable year—

(i) which begins after December 31, 1953, and ends after the date on which this title is enacted, and

(ii) for which expenditures described in paragraph (1) are paid or incurred.

(B) WITH CONSENT.—A taxpayer may, with the consent of the Secretary or his delegate, adopt at any time the method provided in this subsection.

(3) SCOPE.—The method adopted under this subsection shall apply to all expenditures described in paragraph (1). The method adopted shall be adhered to in computing taxable income for the taxable year and for all subsequent taxable years unless, with the approval of the Secretary or his delegate, a change to a different method is authorized with respect to part or all of such expenditures.

of labor, or other elements involved in its construction and installation. All these items, however, are specifically excluded from experimental expenditures by section 1.174–2(b)(4), Income Tax Regs., and because of the absence of evidence it is impossible for us to segregate those costs which are not clearly experimental expenditures from those that might fall into this category. Second, section 1.174–3(b) provides: "If the taxpayer fails to adopt the method [described in sec. 174(a)] for the first taxable year in which he incurs such expenditures, [i.e., research and experimental] he cannot do so in subsequent taxable years unless he obtains the consent of the Commissioner under section 174(a)(2)(B)."

Once again, there is simply no evidence that the taxable year 1964 was the first year in which petitioner incurred research and experimental expenditures or that it obtained the consent of the Commissioner under section 174(a)(2)(B) and section 1.174–3(b)(2), Income Tax Regs., to use the method described in section 174(a). Consequently, the expenditures in question do not qualify for treatment as expenses under section 174(a).

Section 1.174–1, Income Tax Regs., contains the following sentence: "Research or experimental expenditures which are neither treated as expenses nor deferred and amortized under section 174 must be charged to capital account." Accordingly, we hold that they must be charged to the capital account within the rule of the regulation.

Petitioner, both at trial and on brief, asserted that some part of the expenditures constituted the cost for wornout belts and sheaves for the besly grinder. While it is generally held that the replacement of small worn parts of a large machine do not prolong the normal useful life of the machine and the cost thereof may be deductible as an expense, petitioner has provided us with no data as to the cost of the replaced belts and sheaves. For all we know the replacement costs for such items may have been negligible. See *Libby & Blouin, Ltd.*, 4 B.T.A. 910 (1926).

Petitioner argues that the $2,292.25 spent in developing a position loader and the $477.24 spent in developing an X–Y positioner were expenditures incurred in unsuccessfully experimenting with a mechanical flat-position loading setter. These expenditures, petitioner urges, did not result in the acquisition of any capital assets and therefore are deductible expenses for the year in which they were made. This argument has no factual foundation in the record. To the contrary, the evidence shows that petitioner began the construction of these items in June 1964 and that one was finished in November and the other in December, and that both were placed in use in production as of the

end of the taxable year 1964. It was not until April 1965 that these machines were discovered to be unsatisfactory and were replaced by a different type loader.

It is well established that the cost of constructing machinery and equipment having a useful life substantially beyond the taxable year is a capital expenditure. Sec. 1.263(a)–2, Income Tax Regs. We infer from the evidence herein that *as of the close of the taxable year 1964* these machines were considered to have useful lives substantially beyond the taxable year, and only subsequently, in the following taxable year, was it determined that they were not satisfactory and withdrawn from use. Therefore, we conclude that the cost incurred in developing these machines were capital expenditures because of petitioner's failure to prove otherwise.

### Issue 4. Depreciation and Loss on Scrapped Equipment

We find no merit in petitioner's contention that it is entitled to deduct $829.26 as "depreciation" and $34,409.13 as a "loss on scrapped equipment" to correct an error made in the taxable year 1962 but discovered only in the taxable year 1964.

Respondent contends that the deduction of $829.26 for "depreciation" was not raised as an issue in the petition and therefore may not be considered by this Court, and that no deduction in any event is allowable because no loss was sustained during the taxable year 1964.

Notwithstanding the procedural issue, we think petitioner's contention that it is entitled to a deduction for depreciation under section 167(a) with respect to the nonexistent 1000 kv.-a. substation is incorrect. Section 167(a) provides for a deduction for depreciation of "property used in a trade or business." Clearly, the "fictitious" or erroneously duplicated 1000 kv.-a. substation was never "property used in a trade or business" under section 167.

Petitioner has cited no authority for the proposition that a taxpayer is entitled to a deduction in a subsequent year to correct an error made in a prior year resulting in the taxpayer's understating a deductible loss for such prior year. Section 165(a) provides a deduction only for losses sustained *during the taxable year*. Petitioner has not demonstrated that it sustained a loss in the taxable year before us by scrapping or abandoning any equipment for which it is entitled to a deduction. Therefore, we sustain respondent on this issue.

To reflect the concessions made by the parties and the conclusions reached herein,

*Decision will be entered under Rule 50.*