GERALD R. GORMAN and ELIZABETH L. GORMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gorman v. Commissioner
Docket No. 5984-70.
United States Tax Court
T.C. Memo 1974-18; 1974 Tax Ct. Memo LEXIS 299; 33 T.C.M. (CCH) 74; T.C.M. (RIA) 74018; January 28, 1974, Filed John F. Kelly and J. Patrick Doherty, for the petitioners.
William L. Ringuette, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION
GOFFE, Judge: Respondent determined a deficiency in the Federal income tax of the petitioners for the taxable year 1967 in the amount of $7,890.18. 2 Some concessions have been made by the parties. The issues remaining for decision are: (1) Whether petitioners are entitled to a deduction under section 165(a)[1] in the taxable year 1967 for a demolition loss resulting from the partial destruction of certain rental property known as the "Jewel Building"; (2) whether petitioners are entitled to a loss deduction under section 165(a) and 1.167(a)-8(a) (4), Income Tax Regs., because of the alleged sudden termination of the useful life of the Jewel Building within one taxable year as a result of the partial demolition; and (3) whether petitioners are entitled to a redetermination of the useful life of the Jewel Building so that the remaining useful life as of January 1, 1967, would become two years, four months and seventeen days. [2] *301 FINDINGS OF FACT
Some of the facts have been stipulated. The stipulation of facts, the supplemental stipulation of facts and the exhibits thereto are incorporated by this reference. Petitioners, Gerald R. Gorman and Elizabeth L. Gorman, are husband and wife who resided in Chicago, Illinois, when their 3 petition was filed herein. They filed their joint Federal income tax return for the calendar year 1967 on the cash receipts and disbursement basis with the district director of internal revenue at Chicago, Illinois.
Gerald R. Gorman (hereinafter referred to as petitioner) is an attorney at law and was, during the year 1967, president of the Ashland State Bank of Chicago. In addition to his other professional interests, petitioner has, for a number of years, been engaged in the business of purchasing and renting various parcels of commercial real estate. Petitioner's *302 wife has shared in the ownership of some of petitioner's commercial property but does not take an active part in its management.
During 1953 the petitioners purchased eight contiguous lots on 87th Street (hereinafter called the 87th Street property), approximately one-half block east of Stony Island Avenue in Chicago, Illinois, and conveyed title to these lots to the Central National Bank as Trustee under Turst No. 1122. [3] The joint measurements of the lots equaled approximately 200 feet x 125 feet and petitioners each had a one-half beneficial interest in the property. Petitioners 4 acquired these lots with the aid of Lawrence Gailen of Charles S. Schrager Company, a commercial real estate development firm, for the purpose of leasing the property to Jewel Tea Company (Jewel).
On July 15, 1953, petitioner entered into a lease agreement with Jewel *303 with respect to the eight lots. The lease provided for a term of ten years with two five-year options to renew and required the petitioner to construct a building and parking lot to Jewel's specifications. The lease provided for a rental amount equal to 3/4 of one percent of sales in each lease year with a minimum rental per lease year of $12,600.
Pursuant to his obligations under the lease, petitioner constructed a building (approximately 80 feet x 125 feet) and parking lot (approximately 120 feet x 125 feet) at an aggregate cost to him of $86,374.10. Jewel thereafter took possession of the premises under the lease on May 13, 1954. On May 21, 1957, the petitioner and Jewel modified the original lease agreement to include four additional parking lots which had been acquired by petitioner. As consideration for the additional parking space, the annual minimum rent was increased to $17,400 for each lease year.
Beginning in 1954, petitioners claimed depreciation deductions with respect to the 87th Street property on a straight line basis employing useful lives for the various components as follows: 5 Component
Cost
Useful Life Brick Building
$45,236.32
40 years
Leasehold Improvements
28,067.45
10 years
Ceiling, Plaster & Insulation
4,898.26
15 years
Carpentry, Electricity & Plumbing 8,172.07
20 years
Total $86,374.10
*304 Jewel exercised its first option and renewed the lease for a five year term beginning May 17, 1964, and ending May 17, 1969, by letter dated November 26, 1963. Jewel subsequently contacted Lawrence E. Gailen of Charles L. Schrager Company sometime during the year 1965 about developing a new Jewel-Osco Drug complex at 88th Street and Stony Island Avenue in Chicago. The Schrager Company is an independent real estate firm which has assisted the Jewel Tea Company on numerous occasions in the past to obtain leasing space for their stores including the 87th Street property leased to Jewel by petitioners.
In January 1966, petitioner received a letter from Marvin Silverman, attorney for the owners of the property located at the northeast corner of 88th Street and South Stony Island Avenue (hereinafter called the 88th Street property), informing him of the filing of an application for a special use under the zoning ordinances in connection with a proposed building project entitled the Jewel-Osco Development to be built on the owners' property. The special use consisted of obtaining an additional 75 feet of parking space east of the planned parking lot. 6 Petitioner had heard rumors *305 (around the latter part of 1965) about the possibility of Jewel moving into the new location and the letter from Silverman helped to confirm his speculations. In March of 1966, petitioners received a notice of hearing from the City of Chicago Zoning Board of Appeals concerning the 88th Street property, and on August 25, 1966, the application for rezoning was officially approved.
After petitioner initially heard about the possibility of Jewel vacating the 87th Street property, he contacted Lawrence E. Gailen (the real estate agent who handled the original Jewel lease in 1953), and instructed him to find a suitable tenant to replace Jewel. Petitioner did not contact any other realtors nor did he list the 87th Street property with other realty companies.
Gailen made numerous inquiries in an attempt to find a suitable tenant for the 87th Street property during the remaining portion of 1966. Among those businesses contacted as potential lessees were some tire and auto accessory companies, some general merchandising companies and a bank. It is unclear from the record as to why none of these businesses were able to come to terms with the petitioner. But one of the problems which petitioner *306 and Gailen had in finding a substitute tenant was the indefiniteness of the Jewel organization as to when the premises would be vacated.
During the early part of 1966, an exterminating company expressed an interest in leasing space at the 87th Street property. Petitioner 7 was not interested in renting to the exterminating company because he felt that its presence in the neighborhood would detract from the surrounding businesses and he was uncertain whether the company would want to rent the entire space occupied by Jewel. Moreover, many of the surrounding businesses were tenants of petitioner. It was petitioner's hope that he could attract a tenant who would have the same "drawing power" as a grocery store in attracting large numbers of people to the area, thus enhancing the other businesses - many of which had decided to locate in the area because of the presence of the Jewel facility.
At that time it was the policy of the Jewel organization not to terminate leases if their store was moving to a location in the same immediate area unless the lessor would agree not to rent to another grocery store. Petitioner determined that it would be to his benefit to negotiate a lease *307 termination agreement with Jewel agreeing not to rent to another like business because of the increase in insurance rates on a vacant building and the possible detrimental effect of a vacated building on the remainder of the neighborhood.
During February or March of 1966, petitioner was contacted by Peter Maniates, an independent real estate broker acting on behalf of F. W. Woolworth Co. (hereinafter called Woolworth), a variety store chain which was desirous of leasing the 87th Street property. In April 1966, Maniates again contacted the petitioner and requested 8 him to submit a copy of the original floor plans of the Jewel Building so that Woolworth could examine them. After having examined the plans, Woolworth submitted to the petitioner in October of 1966 a proposed plan of the type of building which it would be interested in leasing.
Petitioner then submitted Woolworth's proposed plans to an architect and requested the architect to make a cost estimate of the proposed remodeling. Petitioner later informed Woolworth of the projected cost estimate.
Petitioner and Jewel entered into an agreement designated "Declaration of Restriction and Lease Termination" dated February 27, 1967, which *308 was recorded in the office of the Recorder of Deeds, Cook County, Illinois, on May 1, 1967. The lease termination agreement provided that the existing lease between Jewel and petitioners would be canceled 30 days after the new Jewel store at 88th Street and Stony Island Avenue was completed. The agreement mentioned the date of August 1967 as the projected date of the opening of the new Jewel store, but that date was not binding on the lessee and the actual date of opening controlled. The agreement also provided for a lump sum payment to the lessor from the lessee in the amount of $4,350, and the owner agreed not to lease to a grocery-sundry tenant prior to May 30, 1974. Clause 5 of the agreement - the covenant not to rent clause - mentioned the potential Woolworth lease by name and made exception 9 for the sundry-drug department of the Woolworth store. The moving of the Jewel store from petitioners' building at 87th Street to the new Jewel-Osco complex at 88th Street was contingent upon the granting of the rezoning application. The Woolworth lease was, in turn, dependent upon the termination of the Jewel lease with petitioners.
Central National Bank of Chicago, Illinois, *309 under Trust No. 1122 (the 87th Street property) and F. W. Woolworth Co., entered into a lease (hereinafter called the "new lease") with respect to the eight lots which Jewel had previously leased. The lease was dated November 21, 1966, and signed by the bank as Trustee on January 25, 1967, and by Woolworth on March 1, 1967. A short form of the lease was recorded in the office of the Recorder of Deeds, Cook County, Illinois, on May 1, 1967. The new lease provided for an annual minimum rent of $38,500 for the original term and $30,800 thereafter, including the period of any extension and for additional rental based on sales. The original term of the lease was from the date of delivery of the premises to January 31, 1983. Woolworth had four successive options to extend the term of the lease for any period of time not exceeding five years per option.
Pursuant to the lease with Woolworth, the petitioners constructed at their own expense a one story building and a basement addition to the existing store building (the Jewel Building). The remodeled building had 120 feet of frontage on 87th Street, 15,000 square feet 10 on the ground floor, 5,000 square feet of space in the basement *310 and parking facilities. Construction began in the latter part of 1967. The total cost of the construction borne by the petitioners was $238,012.54.
Late in 1967, a portion of the Jewel building was demolished pursuant to the general contract between petitioners and Architectural Builders Company of Chicago. The construction contract provided, in addition to building a one story structure and adding to the existing basement, that a wall of the existing building which had been finished in white Terra Cotta (a logotype identification front which was constructed by petitioners as a requirement of the original lease) was to be partly demolished and the remainder covered with another material. The terms of the construction contract and other contracts were all complied with by July 31, 1968, the date upon which the Woolworth store was completed and the date upon which Woolworth opened its new store for business. Woolworth's gross sales in the leased premises for the first two full years under the lease, 1969 and 1970, were substantially below the gross sales required under the lease to entitle petitioners to a rental in excess of the minimum rental.
The remaining cost of petitioners' *311 jewel store (original cost less depreciation allowed or allowable) on December 31, 1965, was as follows: 11 Brick Building
$32,136.63
Ceiling, Plaster & Insulation
1,115.74
Carpentry,Electrical & Plumbing 3,439.12
Total $36,691.49 Included in the depreciation schedule for petitioner's Jewel store on December 31, 1965 were:
(a) "Alley - Special Assessment" with original cost of $1,363.20 in 1963, depreciated on straight line basis over a useful life of ten years and with a remaining cost of $1,022.40 on December 31, 1965; and
(b) "Real Estate Commission" with original cost of $1,260.00 in April 1964, amortized over 60 months and with a remaining cost of $840 on December 31, 1965.
On petitioners' 1966 Federal income tax return, depreciation on the Jewel property in accordance with the original useful lives of the respective components, was taken in aggregate amount of $2,254.38, which consisted of the following: Brick Building
$1,130.91
Ceiling, Plaster & Insulation
326.55
Carpentry, Electricity & Plumbing
408.60
Alley - Special Assessment
136.32
Real Estate Commission
252.00
Total
$2,254.38
On petitioners' Federal tax return *312 for 1967, depreciation on the Jewel property for eight months in accordance with the original 12 useful lives of the respective components (not including the real estate commission), was taken in the aggregate amount of $1,335.60, which consisted of the following: Brick Building
$ 754.32
Ceiling, Plaster & Insulation
217.81
Carpentry, Electricity & Plumbing
272.54
Alley - Special Assessment 90.93
Total $1,335.60 In addition, a deduction was claimed for the balance of the Real Estate Commission in the amount of $588.00.
After taking into account depreciation on the Jewel property through eight months of 1967, petitioners' remaining cost on September 1, 1967, was $34,375.91, consisting of the following: Brick Building
$30,251.40
Ceiling, Plaster & Insulation
571.38
Carpentry, Electricity & Plumbing
2,757.98
Alley - Special Assessment 795.15
Total $34,375.91
The portion of the remaining unrecovered cost of the Jewel Building (excluding Terra Cotta) and the portion of the building (at cost) that was demolished (excluding the Terra Cotta) pursuant to the General Contract and other contracts was as follows: Unrecovered Cost of Remaining Structure
Unrecovered Cost of Portion Demolished Brick Building (excluding Terra Cotta)
$26,595.78
$ 8,275.49
Ceiling, Plaster & Insulation
571.38
Carpentry & Electricity
2,757.98
3,124.51
Alley - Special Assessment 795.15
Total $30,720.29
$11,400.00
*313 13 The remaining unrecovered cost of the Terra Cotta at the time of the demolition was $3,655.62. A portion of the Terra Cotta (42 percent or $1,535.36) on the Jewel Building was destroyed. The balance of the Terra Cotta (58 percent or $2,120.26) remained on the south wall of the building, but was completely covered by a material specified by the plans for the Woolworth building.
Beginning in 1968, petitioners depreciated the Woolworth store, with a total cost for depreciation purposes of $254,138.24, consisting of the cost of construction $238,012.54, plus $16,125.70 representing the remaining cost of the Jewel Building as of September 1, 1967, ($34,375.91 less demolition loss of $18,250.21 claimed on petitioners' 1967 return). [4]
OPINION
Issue 1. Claimed Demolition Loss on the Jewel Building Petitioners first contend that they *314 are entitled to a deduction of $12,935.36 in the 1967 taxable year under section 165(a) for losses allegedly sustained as a result of demolition of a part of the Jewel Building. [5] 14 The facts are uncontradicted that petitioners' demolition and remodeling of a portion of the old Jewel Building was a requirement of the remunerative lease agreement between petitioners and the new tenant, F. W. Woolworth. Section 1.165-3(b) (2), Income Tax Regs., provides:
Demolition of buildings. * * *
(2) If a lessor or lessee of real property demolishes the buildings situated thereon pursuant to the requirements of a lease or the *315 requirements of an agreement which resulted in a lease, no deduction shall be allowed to the lessor under section 165(a) on account of the demolition of the old buildings. However, the adjusted basis of the demolished buildings, increased by the net cost of demolition or decreased by the net proceeds from demolition, shall be considered as a part of the cost of the lease to be amortized over the term thereof.
Section 1.165-3, Income Tax Regs., provides generally that a demolition loss deduction will be allowed where the intent to demolish arose after the date of the acquisition and the deduction will not be allowed where the intent to demolish was present on the date of acquisition or immediately subsequent thereto. Section 1.165-3(b) (2), Income Tax Regs., supra (the portion of the regulations dealing with a demolition arising in the context of a lessor-lessee relationship), is a logical extension of the general rule that intent to demolish is determined on the date of acquisition or purchase. If a lease 15 agreement provides for *316 remodeling that contemplates demolition, the intent to demolish is established, ipso facto, at the time the lease is signed. In this case the petitioners' lease with Woolworth contemplated demolition by its terms. The fact that the building was difficult to lease, partly because of petitioners' personal business judgment as to the quality of the tenant sought, is of no avail to petitioners.
The law is well settled that in these circumstances a demolition loss deduction must be disallowed and the cost of demolition must be considered part of the cost of obtaining the lease, thus requiring the costs to be amortized over the term of the lease. See Donald S. Levinson, 59 T.C. 676 (1973); Herman Landerman, 54 T.C. 1042 (1970), affirmed 454 F.2d 338 (C.A. 7, 1971); Nickoll's Estate v. Commissioner, 282 F.2d 895 (C.A. 7, 1960), affirming 32 T.C. 1346 (1959); Blumenfeld Enterprises, Inc. v. Commissioner, 232 F.2d 396 (C.A. 9, 1956), affirming per curiam 23 T.C. 665 (1955). We so hold in this case.
Issue 2. Sudden Termination of the Useful Life of the Jewel Building Giving Rise to a Claimed *317 Section 165 Loss Deduction. Petitioners contend, alternatively, that the entire $15,055.62 should be allowed as a loss deduction under section 165(a) and section 1-167(a)-8(a) (4), Income Tax Regs., because both the portion of the Jewel Building demolished in the amount of $12,935.36 and the portion of the Terra Cotta wall covered by new materials in the amount of $2,120.26 16 represent depreciable assets withdrawn from use because of a sudden termination of their usefulness. Petitioners argue that the Jewel Building was a special use building which became obsolete after the Jewel organization vacated the premises. Petitioners base their claim of extraordinary obsolescence on the fact that the Jewel Building was originally constructed to the tenant's specifications and, because of the terms of the lease termination agreement, could not be leased to another tenant who would utilize the premises in the same way.
Section 1.165-2(c), Income Tax Regs., provides that the allowance under section 165(a) of losses arising from the permanent withdrawal of depreciable *318 property from use in the trade or business is governed by section 1.167(a)-8, Income Tax Regs.Section 1.167(a)-8(a) (4), Income Tax Regs., provides in pertinent part:
Retirements. (a) Gains and losses on retirements. For the purposes of this section the term "retirement" means the permanent withdrawal of depreciable property from use in the trade or business or in the production of income. The withdrawal may be made in one of several ways. For example, the withdrawal may be made by selling or exchanging the asset, or by actual abandonment.
* * *
(4) Where an asset is retired by actual physical abandonment (as, for example, in the case of a building condemned as unfit for further occupancy or other use), loss will be recognized measured by the amount of the adjusted basis of the asset abandoned at the time of such abandonment. In order to qualify for the recognition of 17 loss from physical abandonment, the intent of the taxpayer must be irrevocably to discard the asset so that it will neither be used again by him nor retrieved by him for sale, exchange, *319 or other disposition.
The case of Coors Porcelain Co., 52 T.C. 682 (1969), affirmed 429 F.2d 1 (C.A. 10, 1970), involved consideration of a taxpayer's claim of extraordinary obsolescence with respect to a fuel element building which had been constructed by it to aid in the production of ceramic nuclear fuel elements. The contract with the Atomic Energy Commission under which the taxpayer was producing the fuel elements was canceled and the taxpayer attempted to deduct the adjusted basis of the fuel element building as a section 165(a) loss claiming extraordinary obsolescence, resulting from sudden termination of the useful life of the building within one taxable year.
The term "obsolescence" is not specifically defined anywhere in the Internal Revenue Code or the regulations. Coors Porcelain Co., supra, helped to clarify some of the confusion concerning the difference between (1) "normal" obsolescence which gives rise to a depreciation deduction based upon a fixed useful life of a depreciable asset under section 167, et seq., and section 1.167(a)-9, Income Tax Regs., and (2) "extraordinary" obsolescence which *320 might give rise to an ordinary loss deduction under section 165(a) and section 1.167(a)-8, Income Tax Regs., if the useful life of the 18 depreciable asset is suddenly terminated within one taxable year or cause a redetermination of the fixed useful life of the asset under sections 1.167(a)-1(b) and 1.167(a)-9, Income Tax Regs., if the extraordinary obsolescence occurs over a period greater than one taxable year. In the Coors case, we said at page 689:
The Federal tax law recognizes two separate categories of obsolescence: (1) "Normal" obsolescence or the gradual loss of usefulness due to the normal progress of the arts, invention, technological improvements, changing economic conditions, and legislation; and (2) "extraordinary" obsolescence or the sudden loss of usefulness caused by some unexpected and unforeseen external force.
It is well settled in this Court that "an obsolescence deduction [under section 167] may be availed of only when property becomes useless over a period greater than one year." Keller Street Development Co., supra at 567; W. B. Davis & Son, Inc., 5 T.C. 1195 (1945); *321 Olean Times-Herald Corporation, 37 B.T.A. 922 (1938); TennesseeFibre Co., 15 B.T.A. 133 (1929); William Zakon, 7 B.T.A. 687 (1927); and see generally 4 Mertens, Law of Federal Income Taxation, sec. 23.104. It is likewise settled that a loss resulting from the sudden termination within 1 year of the usefulness of property used in a trade or business is deductible under section 165 and not section 167, even if the cause of such sudden termination of usefulness is extraordinary obsolescence. William Zakon, supra at 690. Although this position was rejected by the Court of Appeals for the Ninth Circuit in Keller Street Development Co., v. Commissioner, supra, and criticized by the First Circuit in Zwetchkenbaum v. Commissioner, 326 F.2d 477 (C.A. 1, 1964), affirming a Memorandum Opinion of this Court, it has been contained in the Treasury regulations since 1918.
This Court in Coors determined, and the parties in this case agree, that the test for "extraordinary" obsolescence under the regulations giving rise to a section 165(a) deduction is: (1) Whether 19 the building's usefulness suddenly terminated in the taxable *322 year in question; and (2) whether the building was permanently withdrawn from use. We found in Coors that the fuel element building "as a whole" was not obsolete because it continued to be used, in part, for at least five years after the claimed termination of usefulness and was not permanently withdrawn from use. The taxpayer made no effort to segregate the portions of the building, if any, that were permanently withdrawn from use and, consequently, we concluded no part of the building qualified for the loss deduction.
It appears from the facts of this case that the only special use portion of the Jewel Building which was physically abandoned by petitioners and sufficiently segregated from the building as a whole, was the Terra Cotta wall covering which served as a special logotype identification front for the Jewel grocery stores. The Terra Cotta covering had no apparent structural function and served only a decorative function which was, in fact, utilized for logo identification. Clearly the Jewel Building as a whole was never abandoned nor permanently withdrawn from use. The act of *323 physical abandonment must be demonstrated by an intention on the part of the owner to abandon the property coupled with an act of abandonment - both of which are to be determined from all the facts and circumstances. United California Bank, 41 T.C. 437, 451 (1964), affirmed per curiam 340 F.2d 320 (C.A. 9, 1965). 20 The Jewel Building may have had other special features besides the Terra Cotta wall covering, but the petitioners made no attempt to segregate those portions, if any, that would enable us to consider their obsolescence. It is our view, however, that the remaining unrecovered cost of the $3,655.62 of the Terra Cotta wall is allowable as a loss deduction because its usefulness was suddenly terminated within one taxable year and it was permanently withdrawn from use. The remaining portion of the claimed loss deduction is properly amortizable over the duration of the Woolworth lease as the costs of capital improvements to the existing building. Issue 3. Redetermination of the Useful Life of the Jewel Building. Finally, the petitioners contend that useful life of the Jewel Building as of January 1, 1967, was two years, four months and 17 *324 days. Since the remaining useful life of the Jewel Building under ordinary depreciation rates would be approximately 17 years as of January 1, 1967, the petitioners have the burden of proving that the remaining useful life of the Jewel Building should be redetermined because of changing conditions known to exist at the end of the taxable year in order to justify the change to two years, four months and 17 days. See section 1.167(a)-1(b), Income Tax Regs.
Section 1.167(a)-9, Income Tax Regs., provides:
Obsolescence. The depreciation allowance includes an allowance for normal obsolescence which should be taken into 21 account to the extent that the expected useful life of property will be shortened by reason thereof. Obsolescence may render an asset economically useless to the taxpayer regardless of its physical condition. Obsolescence is attributable to many causes, including technological improvements and reasonably foreseeable economic changes. Among these causes are normal progress of the arts and sciences, supersession *325 or inadequacy brought about by developments in the industry, products, methods, markets, sources of supply, and other like changes, and legislative or regulatory action. In any case in which the taxpayer shows that the estimated useful life previously used should be shortened by reason of obsolescence greater than had been assumed in computing such estimated useful life, a change to a new and shorter estimated useful life computed in accordance with such showing will be permitted. No such change will be permitted merely because in the unsupported opinion of the taxpayer the property may become obsolete. For rules governing the allowance of a loss when the usefulness of depreciable property is suddenly terminated, see § 1.167(a)-8. If the estimated useful life and the depreciation rates have been the subject of a previous agreement, see section 167(d) and § 1.167(d)-1. [Emphasis supplied.]
The parties agree that a sudden termination of the useful life of a depreciable asset within one taxable *326 year is properly deductible as an ordinary loss under section 165(a) if it meets the requirements of section 1.167(a)-8, Income Tax Regs. See Coors Porcelain Co., supra, 52 T.C. at 689. The parties also agree that extraordinary obsolescence which occurs over a period greater than one year may be recognized by a redetermination of the original useful life of the depreciable asset under section 167(a) and sections 1.167(a)-1(b) and 1.167(a)-9, Income Tax Regs.United California Bank, supra, 41 T.C. at 450-451. The parties disagree, however, on the factual 22 issue of whether the Jewel Building became obsolete over a period greater than one year. In view of our holding that the net adjusted basis of the entire Terra Cotta wall is allowable as an ordinary loss under section 165(a) and section 1.167(a)-8(a) (4), Income Tax Regs., we need only consider the net adjusted basis of the portion of the Jewel Building demolished, less the 48 percent of the Terra Cotta wall demolished.
We have previously held that the petitioners have not proved that the Jewel Building as a whole was permanently withdrawn *327 from use in the trade or business or in the production of income. With the exception of the Terra Cotta wall portion which was adequately segregated from the whole by petitioners, the Jewel Building continued to be used as rental property which housed retail merchandise facilities at a higher rate of rent than the previous tenant. Petitioners did not physically abandon any portion of the building but instead expanded the existing structure in order to secure the new tenant. In these facts and circumstances, we conclude that the Jewel Building is not a suitable candidate for the redetermination of its useful life because the petitioners have not established that the building sustained extraordinary obsolescence. Accordingly, the petitioners' loss deduction for the taxable year 1967 is sustained in the amount of $3,655.62 and disallowed as to the remainder.
Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. In the event petitioners are not entitled to any part of the claimed deductions, respondent concedes that they are entitled to additional depreciation for the year 1967 in the amount of $666.78.↩
3. The legal description of the lots is as follows: Lots 23-30 in Block 3 in Archibold's Stony Island Manor, a Subdivision in the South one-half of the Southwest Quarter, Section 36, Township 38 North, Range 14, East of the Third Principal Meridan, in Cook County, Illinois, also known as 1628 East 87th Street, Chicago, Illinois.↩
4. Petitioners now contend that the total amount of the loss suffered is $15,055.62, rather than the amount of $18,250.21 claimed on their 1967 return. The amount of $15,055.62 consists of the adjusted basis of the property demolished, $12,935.36, and the adjusted basis of the property abandoned, $2,120.26 (58 percent of the Terra Cotta wall).↩
5. Technically, only $12,935.36, the adjusted basis of the property demolished of the total of $15,055.62 deduction claimed would have been allowable as a demolition loss. The remaining $2,120.26 of the $15,055.62 total representing the adjusted basis of the 58 percent of the Terra Cotta wall covered but not demolished in the remodeling must be considered in the context of petitioners' alternative contention of extraordinary obsolescence. ↩