WAH CHANG SMELTING AND REFINING COMPANY OF AMERICA, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 61013. Filed June 30, 1958.

*William T. Glynn, Esq.*, for the petitioner.
*John A. Dunkel, Esq.*, for the respondent.

PIERCE, *Judge:* An income tax deficiency of $13,488.75 for the calendar year 1952 was determined against the petitioner by the respondent.

The sole issue for decision is: Where petitioner constructed and installed a hydrogen-producing facility for its ore-reducing plant, which facility when operated proved to be inefficient and had to be changed in some respects through reconstruction, may that portion of its construction and installment costs prior to the reconstruction, which is allocable to expenditures for labor and materials in respect of certain piping and fittings that were torn out and scrapped during the reconstruction work, be deducted as an abandonment loss under section 23 (f) of the 1939 Code; or should the same be regarded as part of the overall capital cost of the facility as ultimately completed?

### FINDINGS OF FACT.

Part of the facts have been stipulated. The stipulation of facts is incorporated herein by this reference.

Petitioner is a New York corporation with its principal office in New York City. Its return for 1952, the taxable year involved, was filed with the collector of internal revenue for the second district of New York.

Petitioner at all times here material was principally engaged in the production of tungsten concentrates and the manufacture of tungstic

acids and tungstic powders, rods, and wires. It also refined other metals, such as tin, antimony, and molybdenum. Its principal manufacturing plant was located at Glen Cove, New York.

In October 1951, petitioner commenced the erection of a building at Glen Cove for the primary purpose of housing equipment for the production of metallic tungsten powder. Such production required the use of reduction furnaces wherein tungsten oxides were heat treated. These furnaces could have been fueled either by carbon, natural gas, manufactured gas supplied by a local utility (called city gas), or hydrogen gas. Petitioner's management decided to use hydrogen gas, because this fuel was the most efficient. Hydrogen gas could have been purchased from an outside supplier; but petitioner decided, prior to commencement of the construction of the above-mentioned building, to manufacture its own hydrogen gas, for reasons of convenience and also to assure the necessary quality.

The process of producing, treating, and feeding hydrogen gas to reduction furnaces, in a facility of the type decided upon by petitioner's management, may be briefly described as follows: The hydrogen is first generated in banks of cells by a process known as electrolysis. Electrolysis involves passing electric current from a generator through water in a series of cells, thus causing the water to be separated into its component elements of hydrogen and oxygen. The oxygen is passed off as waste. The hydrogen is then forced by pressure of an air compressor through various stages, so that it is cooled and dried preparatory to being introduced into the reduction furnaces. This process of producing hydrogen has been known for more than 20 years, and there are numerous plants throughout the country which employ it. The hydrogen-generating cells are similar in all installations which employ the process; but there are many variations in other phases of the process, owing to the differing uses to which the hydrogen may be put, and to the consequent need for varying degrees of dryness, purity, rate of flow, and the like. Petitioner's officers were confident at all times that a hydrogen-producing facility of the type above described could be installed in petitioner's plant, and that such facility would yield hydrogen in the quantity and quality desired.

After petitioner had begun construction of the building which was to house its reduction furnaces and hydrogen-producing facility, it retained an individual named Benbow on a part-time basis, to develop an overall plan or scheme for the facility. Benbow had theretofore invented the hydrogen-generating cells which petitioner had decided to use in its facility, and he also was the founder of the company from which such cells were purchased. Another engineering employee of the petitioner, named Noel, was charged with the duty of consulting with Benbow, drawing up the plans, and

supervising the construction and installation work. Noel left petitioner's employment sometime prior to June 1952, before he had finished his work; and he was replaced by another engineering employee named Walter Habeck.

Habeck thereafter drew up detailed plans for the hydrogen-producing facility, and was in charge of supervising the work incident to constructing and installing the necessary fixtures and equipment. The actual construction commenced in July 1952 and continued for about 3½ months until approximately October 15, 1952, when a complete hydrogen-producing facility was achieved. Up to October 15, 1952, petitioner expended $21,008.93 for the following items pertaining to the construction and installation of equipment for the facility: $3,312.06 for piping, $5,413.22 for fittings, and $12,283.65 for contractors' labor. The record does not disclose the cost of various equipment installed, such as the hydrogen-generating cells, an electric generator, hydrogen storage tanks, and several compressors.

After the facility had been connected with the reduction furnaces and put into operation, it proved to be unsatisfactory, because it did not produce hydrogen in sufficient quantity or with requisite dryness. This failure was due to several errors in Habeck's design, which could not have been anticipated or discovered while the construction work was in progress. Thereupon, petitioner's officers decided to make changes in the hydrogen-producing facility; and one of its engineering employees, Alfred C. Wu, drew up plans embodying certain changes and eliminations which were aimed toward correction of the existing errors in design. The names of Benbow and Wu appear on the drawings for such changes, as the designers.

The reconstruction work for giving effect to such changes was commenced in November 1952, and was completed prior to December 31, 1952. The changes and eliminations made may be summarized as follows:

As regards the cell room, the electrolytic cells had functioned properly; but owing to the discovery that the facility was losing slightly more hydrogen gas than had been anticipated, 10 cells were added to each of the 2 then existing 20-cell banks. Also, 2 of the 3 hydrogen traps were eliminated; and the remaining hydrogen trap plus an oxygen trap were moved to another part of the same room, apparently to allow space for the added electrolytic cells.

In an adjoining room called the compressor room, the generator which was used to supply electric current to the electrolytic cells, was moved to a spot just outside the cell room; and the control panel used in connection with such generator was replaced by a new one. Also, there were added a new electric device called an exciter, and a control panel therefor; and these were placed adjacent to the relocated generator and panel. In addition, a second air compressor

was installed to supplement the existing one which was retained. An existing blower was turned halfway around, and two new blowers were installed. A cooling tower was moved from the compressor room to a point outside. Two hydrogen compressors which had previously been installed were retained in position, but they were no longer used because of a directive by the Navy which forbade the use of the hydrogen storage sphere which had theretofore been installed for use with the compressors. Also in connection with the elimination of these hydrogen compressors, two cylindrical tanks called ballast receivers, and another item of equipment called an "after receiver," were eliminated; and both the ballast receivers and the "after receiver" were replaced by a cylindrical tank called an "$H_2$ Scrub Column."

Outside of the cell and generator rooms, 14 hydrogen cylinders were moved to a new position just outside the cell room. Four drying towers were partially dismantled, and the internal portions thereof were replaced; and the positions of the towers, as so modified, were shifted slightly. Also, 1 of 2 spheres called "gasometers," which were storage tanks for hydrogen, was eliminated; and the superstructure of the other was altered so as to correct errors in Habeck's design thereof.

Of the previously installed piping, 80 per cent thereof (having a cost of $2,649.65), was reused; and of the previously installed fittings, 40 per cent (having a cost of $2,165.29) was reused. The remainder of such previously installed piping and fittings could not be reused, and was scrapped and discarded.

In addition to reusing the above-mentioned percentages of previously installed piping and fittings, petitioner spent in the reconstruction work $971.75 for new piping, $1,758.44 for new fittings, and $11,177.06 for contractors' labor. The record does not disclose the cost of the additional equipment added, such as the second compressor, the two new blowers, and the new "$H_2$ Scrub Column."

Petitioner, in its income tax return for the calendar year 1952, deducted as an "expense" incident to the above-mentioned changes and eliminations with respect to its hydrogen-producing facility: $20,179.22 for "Plant engineering," and $5,838.50 for "Repairs and supplies," or a total of $26,017.72. The respondent however, in his notice of deficiency, disallowed such claimed deduction, on the ground that said expenditures were deemed to be capital expenditures, on which depreciation would be deductible commencing in 1953.

Thereafter the petitioner, in its petition to this Court, receded from the "expense" deduction of $26,017.72 claimed in its return; and, instead, it claimed deduction for an abandonment loss of $16,193.99, on the theory that it had abandoned the hydrogen-producing facility as it existed on October 15, 1952, and had thereafter built another

separate and distinct facility. The amount so claimed as an abandonment loss represents the difference between: (1) Petitioner's above-mentioned construction and installation expenditures of $21,008.93 for piping, fittings, and labor in connection with the facility up to October 15, 1952; and (2) the amount of $4,814.94 which was its cost for those materials that were reused in its additional construction work during November and December of the same year.

Petitioner's hydrogen-producing facility, as it existed on October 15, 1952, was not abandoned; the construction and installation work done during the following months of November and December 1952, involved only the making of certain changes and eliminations necessary to correct errors in the original design of said facility; and no new separate and distinct facility was constructed and installed during said later months.

## OPINION.

Petitioner's primary contention, as hereinabove suggested, is that the hydrogen-producing facility, as it existed on October 15, 1952, was an entirely separate and distinct facility from that which was finally completed on about December 31, 1952; that such prior facility was entirely abandoned, except for certain piping and fittings that were later reused; and that an abandonment loss should be allowed under section 23 (f) of the 1939 Code, for the cost of the piping and fittings originally installed, together with expenditures for labor incident thereto, to the extent that such material was not reused.

We think that the record does not support such contention that two separate and distinct facilities were built, and that the first of these was abandoned. The evidence discloses, to the contrary, that the situation was substantially as follows: Petitioner had decided to build a hydrogen-producing facility, for producing hydrogen gas to be used in its metal-refining operations. The method to be employed in the facility for producing such gas had long been known, and was used by many other plants; and the specific problem presented was merely to "tailor" a facility which would best meet petitioner's individual needs. After a design for such facility had been formulated, and after the facility had been constructed in accordance with such design, it did not function with the efficiency that had been anticipated. Therefore, the original design was revised and additional construction and installation work of a remedial nature was undertaken, which included the relocation of certain major items of equipment, the elimination of a few items, and the substitution of other items. In connection with this work, some of the previously installed piping and fittings had to be torn out and discarded; but 80 per cent of the original piping and 40 per cent of the original fittings were reused. The building was not changed; and the

great bulk of the equipment remained unchanged, although some of the items were modified and the position of other items was rearranged. The facility as finally completed, employed the same long-established method which petitioner had been confident from the beginning could be adapted to serve its individual needs.

Petitioner's hydrogen-producing facility was more than the particular piping and fittings in respect of which the abandonment loss has been claimed. It included also many major items of essential equipment which continued to be used, and in respect of which no loss has been claimed. The piping and fittings merely connected up these major items of equipment. It is clear to us, from a consideration of all the evidence, that what petitioner really did during the months of November and December 1952 was merely to make and effect certain remedial changes in the original design, in order to correct errors discovered and thereby enable the facility to function with the desired efficiency. Such remedial changes are not unusual, where an established process is "tailored" to meet a particular need.

A similar situation was presented in the case of *Driscoll* v. *Commissioner*, (C. A. 5) 147 F. 2d 492, affirming a Memorandum Opinion of this Court. There, the taxpayer had undertaken construction of a hotel and office building; and, after the construction work had progressed to a point where an air-conditioning system was installed, it was found that the air-conditioning system, as designed, did not function satisfactorily. The taxpayer then decided to make changes in its original plans. In carrying out these changes, some of the cold air ducts which had already been installed, were removed; and these and certain other materials were scrapped. The taxpayer, in her income tax return, claimed an abandonment loss, for such rejected materials and also for the labor costs incident to the installation and removal of the same. The Court of Appeals for the Fifth Circuit, in affirming the decision of this Court that the deduction was not allowable because said expenditures constituted part of the overall cost of the building as finally completed, said at page 494:

We agree with the Tax Court in its conclusion that taxpayer was not entitled to deduct as an expense the items claimed as losses wrought by changes in connection with the construction of the hotel, and that cost of changes in design made before or during construction, whether these changes are necessitated because of mistake or otherwise, are but a part of the cost of the structure as finally completed. Extra expenses due to errors in plan and design are a part of the cost that the building traffic must bear. As the Tax Court well said: "The acceptance of petitioner's theory would result in a deductible loss in practically every construction project. Common experience tells us that no construction job is carried out with such perfection that some material, because of error, mistake, or even slight change in design, is not removed and therefore does not remain a part of the completed structure. Such expenditures are, we think, clearly a cost of construction."

We think that the foregoing statement is equally applicable to the facts of the instant case; and that the decision of the Court of Appeals in said case should be followed here.

Moreover, abandonment losses are deductible only upon closed transactions. Here, we find that there was no closed transaction on October 15, 1952; rather, the development of the hydrogen-producing facility continued to go forward, incorporating the remedial changes necessary to eliminate defects in the original design, and to make it work satisfactorily.

Petitioner relies principally, for support of its position, on *Dresser Manufacturing Co.*, 40 B. T. A. 341. That case, however, is distinguishable. There, the taxpayer corporation which was engaged in the business of manufacturing pipeline couplings and fittings, undertook to develop a new product for sale in its business, consisting of a gas compressor engine. In 1931 it designed and began development of "Engine No. 1," and continued such work until 1933. It then determined that such engine was a failure; and the engine was scrapped, the blueprints were destroyed, and the project was abandoned. In 1934 the taxpayer began work on "Engine No. 2," which bore little similarity to "Engine No. 1." At the end of 1934, this engine likewise was determined to be a failure, and was abandoned. In 1935 the taxpayer began experimenting on "Engine No. 3," but this also proved worthless; and in 1937 the taxpayer's entire plan for developing an engine was dropped. This Court held that, in such situation, the taxpayer was entitled to deduct as losses in 1933 and 1934, respectively, the amounts which it had expended and charged off on its books in those years, in connection with its unsuccessful experimental work on the first two engines. We said at page 346:

The whole plan of construction of an engine which it was hoped would accomplish the desired result was abandoned, the design was changed, the patterns and blueprints were discarded * * *. The consulting engineer testified that Engine No. 1 had no salable value at the end of 1933 and "was not a practical engineering proposition." * * *

Nor is the situation materially different as to Engine No. 2 and the expenditures made during 1934. * * *

In the instant case, petitioner's hydrogen-producing facility, although it originally had defects which prevented it from functioning satisfactorily, was at no time a total failure in the same sense as were the taxpayer's engines in the *Dresser* case. It was not an experimental project in an unexplored field; but was, rather, a practical engineering proposition for adapting an established process to individual needs. Nor did petitioner abandon the facility on October 15, 1952, and then start over *de novo* as did the taxpayer in the *Dresser* case. To the contrary, petitioner merely made certain technical changes in the design of the facility, so as to improve the flow, dryness, and

purity of the hydrogen product. It retained the great bulk of the facility intact.

After seeing and hearing all of the witnesses, and after examining and weighing all of the evidence, we are convinced that petitioner is not entitled to the abandonment loss deduction which it has claimed. We decide the present issue in favor of the respondent.

*Decision will be entered for the respondent.*