ROBERT B. HASPEL AND SHIRLEY K. HASPEL, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4365–71, 4366–71, 4461–71, 8127–71, 8111–71, 8112–71, 3238–72. Filed April 18, 1974.

*G. Robert Fisher* and *Stanley D. Weiner*, for the petitioners.
*Edward G. Lavery*, for the respondent.

---

[1] Proceedings of the following petitioners are consolidated herewith : Edward A. Smith and Beth K. Smith, docket Nos. 4366–71, 8111–71 ; Esther L. Krasne, docket Nos. 4461–71, 8112–71 ; Edward A. Smith, Esther L. Krasne, Walter Neustadt, Jr., and Robert B. Haspel, Trustees of The Hyman W. Krasne Family Trust, Trust B and Trust C, created under Trust Indenture dated March 23, 1963, docket No. 8127–71 ; Maurice J. Bluhm and Ethel M. Bluhm, docket No. 3238–72.

60

STERRETT, *Judge:* The respondent determined the following deficiencies in the petitioners' Federal income tax:

| Petitioner | Docket No. | Year | Amount |
|---|---|---|---|
| Robert B. and Shirley K. Haspel | 4365–71 | 1966 | $13,600.13 |
| | 4365–71 | 1967 | 4,851.21 |
| Edward A. and Beth K. Smith | 4366–71 | 1966 | 14,346.32 |
| | 4366–71 | 1967 | 5,223.31 |
| | 8111–71 | 1968 | 8,128.74 |
| Esther L. Krasne | 4461–71 | 1966 | 13,056.71 |
| | 4461–71 | 1967 | 6,805.34 |
| | 8112–71 | 1968 | 9,035.00 |
| Edward A. Smith, Esther L. Krasne, Walter Neustadt, Jr., Robert B. Haspel, Trustees of the Hyman W. Krasne Family Trust, Trust B and Trust C | 8127–71 | 1966 | 13,056.71 |
| Maurice J. and Ethel M. Bluhm | 3238–72 | 1969 | 3,349.28 |

The issues we must decide are as follows:

(1) Whether the partnership, Plaza Inn, abandoned certain architectural and interior design plans thereby making the expenses incurred in the production of those plans deductible under the provisions of section 165, I.R.C. 1954.[2]

(2) If such abandonment took place did it occur prior to February 16, 1966, when the plans belonged to another entity.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with attached exhibits, are incorporated herein by this reference.

Petitioners Robert B. Haspel and Shirley K. Haspel (hereinafter the Haspels) are husband and wife, and resided at the time of the filing of their petition herein at Metairie, La. The Haspels filed joint Federal income tax returns for the calendar years 1966 and 1967.

Petitioners Edward A. Smith and Beth K. Smith (hereinafter the Smiths) are husband and wife, and resided at the time of the filing of their petition herein at Kansas City, Mo. They filed joint Federal income tax returns for the calendar years 1966, 1967, and 1968.

Petitioner Esther L. Krasne (hereinafter Mrs. Krasne), an individual, resided at the time of the filing of her petition herein at Kansas City, Mo. Mrs. Krasne filed a joint Federal income tax return for the Calendar year 1966 with her husband Hyman W. Krasne, who died on February 12, 1966. She filed individual Federal income tax returns for the calendar years 1967 and 1968.

On or about February 23, 1966, Edward A. Smith and Mrs. Krasne were duly appointed coexecutors of the estate of Hyman W. Krasne,

---

[2] All Code references herein are to the Internal Revenue Code of 1954, as amended and is applicable to the taxable year involved, unless otherwise indicated.

deceased, by the Probate Court of Jackson County, Mo. On May 6, 1970, the estate of Hyman W. Krasne was closed and the coexecutors were discharged by the Probate Court.

Petitioners Edward A. Smith, Esther L. Krasne, Walter Neustadt, Jr., and Robert B. Haspel, trustees of the Hyman W. Krasne Family Trust, Trust B, and Trust C, created under trust indenture dated March 23, 1963, maintained an address for the trust at Kansas City, Mo. The trustees aforementioned received assets from the estate of Hyman W. Krasne and are liable as transferees for any deficiency in income tax due from the estate for the decedent's taxable year 1966, plus interest at the rate of 6 percent per annum from April 15, 1967, to the date such liability is paid.

Petitioners Maurice J. Bluhm and Ethel M. Bluhm (hereinafter the Bluhms) are husband and wife, and resided at the time of the filing of their petition herein at Lake Lotawana, Mo. They filed joint Federal income tax returns for the calendar years 1966, 1967, 1968, and 1969.

In 1962 the Bluhms and Sam Aidner and Eleanor Aidner (hereinafter the Aidners), who were husband and wife, considered the possibility of acquiring a parcel of land one-half block east of the southeast corner of 45th and Main Streets, Kansas City, Mo., for the purpose of constructing a hotel-motel inn thereon. During 1963 the Bluhms and the Aidners purchased such land, receiving a warranty deed dated October 21, 1963.

In 1962, Plaza Motor Inn, Inc. (PMI), a corporation owned 50 percent by the Bluhms and 50 percent by the Aidners, negotiated a lease with respect to adjoining land on the southeast corner of 45th and Main Streets. This lease was executed on March 1, 1963. PMI was incorporated under the laws of the State of Missouri on June 11, 1962. At all relevant times PMI's taxable year was the fiscal year ended on May 31.

As a result of the announcement that a hotel was being contemplated, a number of architects contacted Maurice J. Bluhm and Sam Aidner. PMI retained Leo Kornblath Associates (hereinafter Kornblath), an architectural firm located in New York, N.Y. Kornblath had been involved with the design of many hotels and PMI believed Kornblath could design a motor hotel to be built on the two parcels of land.

Pursuant to agreement Kornblath's services were to consist of:

(a) The preparation of first preliminary sketches of the entire project, showing Kornblath's suggested layouts and arrangements. These sketches were to be used as a basis for discussion and for the purpose of preparing final preliminary plans.

(b) The preparation of final preliminary plans, outline specifications, and a colored rendering of the exterior in sufficient detail to enable PMI to obtain estimates of the probable cost of the project and to further enable PMI to submit them to lending institutions with a view toward obtaining mortgage commitments.

(c) Upon PMI's written authorization, Kornblath was to prepare complete working drawings, details, and specifications and was to file all necessary drawings with the applicable local agencies for the obtaining of approval of such agencies. Kornblath was also to provide architectural supervision for the project; check, correct, and approve all shop drawings submitted by the various contractors in pursuance of their contract; prepare certificates of payment as the contractors completed portions of their work; and coordinate the mechanical and structural drawings with the designs prepared for the interiors by others which were to be incorporated in the Kornblath designs. The architectural supervision could be performed either by Kornblath or by a local Kansas City architect obtained by Kornblath at PMI's option.

According to the agreement, Kornblath's compensation was to be an amount equal to 5 percent of the total cost of construction, exclusive of construction indicated on certain interior design drawings and bowling alley drawings. All drawings required for interior design furnishings, fixtures, kitchens, bar equipment and layout, bowling alley and pin spotted facilities were to be provided by PMI. The agreement also provided that Kornblath was to be partially reimbursed for its travel expenses and further provided that Kornblath was to be allowed additional fees if PMI requested major architectural revisions or changes to the working drawings.

The agreement also provided that all original sketches, studies and plans, drawings, specifications, and instruments of service were at all times to be Kornblath's property, and could be used only by PMI in connection with the creation of the project and only as long as Kornblath was retained as architect.

Prior to 1962 the zoning ordinances of Kansas City, Mo., applicable to the site of the proposed hotel, did not permit the construction thereon of any hotel exceeding two stories in height.

Subsequent to April 30, 1962, Kornblath prepared preliminary drawings to be used in an effort to get the property rezoned. On June 18, 1962, Leo Kornblath, head of Kornblath, at the request of Bluhm and Aidner, appeared before the City Planning Commission of Kansas City, Mo., in support of a pending application for rezoning. On June 19, 1962, he met with members of the commission's staff in connection with the effort to get the property rezoned. Thereafter the property was rezoned to permit the construction of a hotel exceeding two stories.

By document dated January 8, 1964, PMI obtained a favorable construction and permanent loan commitment from First Mortgage Investment Co. for $2,500,000. Metropolitan Life Insurance Co. was the actual lender, with First Mortgage Investment Co. the mortgage broker. The commitment, as amended on October 27, 1964, required among other things, that construction of the hotel commence by December 26, 1964, or the commitment could be canceled at the lender's option.

On or about February 25, 1964, Integrated Design Associates, Inc. (hereinafter Integrated), a corporation with offices in Beverly Hills, Calif., was retained to work with Kornblath in connection with the functional aspects of the design of the kitchens and food operations and the designing of the decor and furnishings of the interior of the hotel. Kornblath was materially involved in the decision to retain Integrated since he believed that interior design was a vital part of the architecture. Kornblath intended to have a close working relationship with Integrated.

During the period 1962 through 1965 Horwath & Horwath, a public accounting firm specializing in motel and hotel auditing, prepared economic feasibility studies for the proposed project. Kornblath was advised of the cost limitations of the project, but was never shown the Horwath & Horwath studies.

Between May 1962 and November 1964 Kornblath worked at preparing architectural plans, specifications, and drawings for the proposed hotel. By November 1964 the plans were largely completed. However, the structure as planned was not considered to be economically feasible pursuant to the studies by Horwath & Horwath.

During this period a partnership, known as the Plaza Motor Inn Agency Account (hereinafter Agency), was formed by agreement dated November 2, 1964, to continue the project. Agency continued in existence until February 15, 1966. The partners of Agency were as follows:

| Partner | Partner's percentage interest in profits or losses of partnership | Partner | Partner's percentage interest in profits or losses of partnership |
|---|---|---|---|
| Richard S. Levitt | 8 | Dolores K. Neustadt | 8 |
| Edward A. Smith | 8 | Shirley K. Haspel | 8 |
| Esther L. Krasne | 8 | Plaza Motor Inn, Inc. | 60 |

In order to satisfy the terms of the loan commitment regarding commencement of construction and at the recommendation of Kornblath, it was decided to proceed with earth excavation and the construction of the foundations pursuant to the Kornblath plans. The

decision to proceed was based on Kornblath's assurances that it would thereafter be able to develop plans for the superstructure that would meet the cost requirements set for the project.

On or about November 24, 1964, a contract for construction of the foundation was let to Swenson Construction Co. (hereinafter Swenson), which, during late 1964 and early 1965, constructed the foundation at a cost of $425,699.34.

The foundations as constructed were for a building consisting of three wings enclosing a square courtyard on the north, east, and south sides (hereinafter building A). The west side of the courtyard was almost enclosed by a foundation for a square building (hereinafter building B) which adjoined the south wing of building A, but did not quite extend far enough northward to connect directly with the north wing of building A. The tract of land upon which the foundation was built was irregular in shape and sloped sharply. The average grade was about 10 percent.

In early 1965 Kornblath presented its set of architectural plans, specifications, and drawings for the superstructure and competitive bids were thereafter invited with respect to it. The lowest bid after adjustment for certain modifications was in the amount of $3,950,711, but this amount exceeded the figure Agency considered to be economically feasible. Agency lacked the financial wherewithal to proceed based on this bid price, and it accordingly requested Kornblath to modify the plans in order to reduce the costs of the project. During 1965 Kornblath attempted to modify the design of the superstructure to meet the cost requirements. However the modifications were not significant.

Prior to September 1965 W. W. Bond, Jr. & Associates (hereinafter Bond), an architectural firm located in Memphis, Tenn., specializing in the design of Holiday Inn motels, was requested to study the existing foundation to determine whether it could design a superstructure to be built thereon within Agency's budget.

By September 1965 Bond had prepared rough sketches and schematic drawings of a superstructure to fit on the foundation as built. These sketches and drawings were sufficiently detailed to show the proposed rooms and their locations. However, because Kornblath was still under contract to design the project, Bond refused to draft "hard line" drawings or working drawings.

In early February 1966 Bond preliminarily indicated that it believed it could design a superstructure within Agency's budget requirements to be constructed on the existing foundation (with some minor modification to the foundation). Bond indicated that it needed to proceed in more detail but that ethically it could not do so as long as another architect was under contract to design the building.

Maurice J. Bluhm, as president of PMI, drafted a letter with the assistance of his attorney notifying Kornblath that its services were being terminated. The letter, dated February 8, 1966, read as follows:

As you know, it has proved to be impossible on the basis of the plans and specifications prepared by you to proceed with the construction project contemplated by the letter agreement between us dated May 24, 1962.

You yourself have recognized this and in effect terminated your agreement and your employment thereunder several months ago when you refused to participate in any manner in the various steps necessary with respect to the work of Swenson Construction Company or the amount due it under its construction contract covering the footings and foundation. As recently as January 5, 1966, Edward A. Smith, acting as attorney for Plaza Motor Inn, Inc., wrote to you on our behalf and asked for assistance in the manner set forth in that letter, which assistance we believe was clearly required from you as the architect on the job and your response of January 11th made it obvious that you were still refusing to furnish any services of any kind.

Although, as indicated above, you already terminated the agreement and your employment thereunder, it seems to us that under the circumstances we should probably expressly confirm such termination. Accordingly, you are hereby notified that your employment as an architect for the Plaza Inn is terminated. We are returning to you under separate cover the plans and specifications prepared by you and your firm. If a project should materialize on the site, it will be based on different plans and specifications.

We are aware of your claim for additional fees. Our position is that with prior payments to you aggregating $127,314.58 you have been paid sums far in excess of any to which you could possibly be entitled under your agreement. Further, our position is that you, your agents and employees have also caused us substantial additional damages. We nevertheless continue to desire to work out a mutually satisfactory settlement with you. Ed Smith has previously advised you that he is prepared, on our behalf, to meet with you to attempt to resolve this dispute and he has confirmed to us that he is willing to meet with you at a mutually satisfactory time and place.

Agency retained at least one set of Kornblath's architectural plans, specifications, and drawings. Since Integrated had been retained to work with Kornblath, the services of Integrated were also terminated. Between July 3, 1962, and October 11, 1965, payments were made as follows in connection with Kornblath's development of architectural plans for the hotel:

| | |
|---|---:|
| Architectural fees paid to Kornblath | $115,744.82 |
| Travel, hotel, and food | 4,257.05 |
| Blueprints and specifications | 3,907.81 |
| Total | 123,909.68 |

Between March 6, 1964, and August 20, 1965, payments were made as follows in connection with the development of the design of the kitchens and food operations and the planning of the decor and furnishings of the interior of the hotel:

| | |
|---|---:|
| Fees paid to Integrated | $54,277.44 |
| Travel, hotel, and food | 3,526.56 |
| Total | 57,804.00 |

On February 16, 1966, Plaza Inn Co. (hereinafter Plaza Inn), a partnership, was formed. All of Plaza Inn's partners were corporations. These corporations were entitled to share in the profits or losses of the partnership and were themselves owned by individual shareholders as follows:

| Corporate partners | Partners' percentage interests in profits or losses of partnership | Shareholders of corporation | Percentage corporate stock owned by shareholders |
|---|---|---|---|
| E.L.K. Investment Co., Inc. | 45 | Esther L. Krasne | 33⅓ |
| | | Dolores K. Neustadt | 33⅓ |
| | | Shirley K. Haspel | 33⅓ |
| Ten-Ten Investment Co., Inc. | 15 | Edward A. Smith | 50 |
| | | Beth K. Smith | 50 |
| Bluhm Investment Co., Inc. | 12.5 | Maurice J. Bluhm | 50 |
| | | Ethel M. Bluhm | 50 |
| Plaza Motor Inn, Inc. | 25 | Maurice J. Bluhm | 25 |
| | | Ethel M. Bluhm | 25 |
| | | Sam Aidner | 25 |
| | | Eleanor Aidner | 25 |
| Aidner Investment Co., Inc. | 2.5 | Sam Aidner | 50 |
| | | Eleanor Aidner | 50 |

E.L.K. Investment Co., Inc. (hereinafter ELK), and Ten-Ten Investment Co., Inc. (hereinafter Ten-Ten), were each incorporated under the laws of the State of Missouri on February 8, 1966. Bluhm Investment Co., Inc. (hereinafter Bluhmco), was incorporated under the laws of the State of Missouri on February 9, 1966. The first taxable period for each of these three corporations ended December 31, 1966, and thereafter at all relevant times their taxable year was the calendar year.

ELK, Ten-Ten, Bluhmco, and PMI each validly elected to be taxed as a small business corporation under subchapter S of the Internal Revenue Code of 1954, and the elections were in effect for each taxable period or year involved in this case.

ELK and Ten-Ten filed U.S. small business corporation income tax returns for the taxable period February 8, 1966, to December 31, 1966, and the taxable years 1967 and 1968. Bluhmco filed U.S. small business corporation income tax returns for its taxable period February 16, 1966, to December 31, 1966, and its taxable years 1967 and 1968.

Prior to the execution of the partnership agreement, an oral commitment was sought and obtained from Commerce Trust Co., a bank located in Kansas City, Mo., in the amount of $3,750,000 to finance the project through construction.

Plaza Inn was the successor to Agency. The architectural plans for decor and furnishings (insofar as they were completed) were originally the property of PMI, but they were transferred and assigned by PMI to Agency on or about November 2, 1964, and were again transferred by Agency to Plaza Inn on or about February 16, 1966.

Pursuant to the partnership agreement dated February 16, 1966, Plaza Inn assumed the obligations of PMI in respect of the architectural contract with Kornblath and the contract for interior design with Integrated.

At the time of the formation of the partnership it appeared that additional capital would be necessary for the project. As a condition of providing the requisite financial support, the original minority partners in Agency demanded a larger share of the partnership.

During the period mid-February through mid-March, Bond further developed its rough sketches but did not draft working drawings. Based upon assurances that plans could be developed to meet the cost requirements, Bond was retained on March 17, 1966, to design the superstructure. Pursuant to the written agreement Bond was to perform all necessary architectural services including complete architectural plans, mechanical plans, structural plans, large and small size details, and specifications.

According to the agreement Bond's fee was to be $35,000 plus an additional amount if Plaza Inn requested changes or revisions to drawings. Bond was also entitled to extra fees if it was required to make an onsite inspection or had to furnish an extra set of drawings.

Turnbull-Novak, Inc., a corporate firm of engineers and architects in Kansas City, Mo., was retained to assist Bond and to supervise construction. At that time the partnership still felt the original Kornblath plans might be of some value in the event Bond could not develop a workable set of architectural plans.

By the end of March 1966, Bond had developed a set of plans, drawings, and specifications for the superstructure. In designing the superstructure, in the interest of economy, Bond sought to utilize as much of the existing foundation as possible, and therefore the Bond superstructure was similar in some respects to the superstructure designed by Kornblath. Without the existence of the Kornblath foundation Bond could have designed a more economical structure. The lateral dimensions of the buildings were approximately the same in both sets of plans.

The Kornblath plans provided for an 11-story structure as the south wing of building A. The entire top floor of this structure consisted of a large penthouse or rooftop restaurant and terrace. In addition, on the main floor level of this south wing, a coffeeshop and three large meeting rooms were planned. The remaining floors of the south wing were to contain guestrooms. The walls of the superstructure of the south wing had been designed by Kornblath to be constructed of reinforced concrete. The east and north wings of building A were planned as two-story structures with guestrooms on the second level and on the interior side of the first level. The exterior side of the first level provided for covered parking under the second level and no guestrooms were located on the first level exterior side in these plans.

The Bond plans provided for a five-story structure as the south wing of building A. All floors of the wing were to contain guestrooms. There was no rooftop restaurant or coffeeshop in building A as designed by Bond. In the Bond plans, the first three stories of the south wing were designed to be constructed of reinforced concrete and the balance was to be constructed of block with weight-bearing walls. Such change in design by Bond resulted in a substantial reduction in the cost of construction. The east and north wings of building A were designed by Bond as a two-story structure containing guestrooms on both the interior and exterior sides of both stories of these wings, thus eliminating the parking stalls found in the Kornblath plans. The redesigning of building A resulted in the elimination of some parking, but the addition of 62 guestrooms in that building.

Kornblath's design for building B contained a large convention hall, several large lobbies, and a dining room on the ground level. Below the main level there were two levels of parking. On the upper parking level Kornblath's plans provided for a sundry shop, beauty shop, barber shop, and a large kitchen, while the lower of the two levels was designed all for parking. Also in building B, the Kornblath plans provided for a mezzanine above the ground floor lobby to be used for office purposes.

In the Bond plans for building B, the ground level contained the main lobby, two large restaurants, a coffeeshop, a bar, and the main kitchen as well as a barber shop, a beauty shop, a gift shop, and executive offices. The Bond plans provided for the convention hall, meeting rooms, hospitality suites, banquet kitchen, and other service and office facilities on the first lower level of building B. The mezzanine floor did not appear in the Bond plans.

Approximately 20 percent of the existing foundations were abandoned when the superstructure was built according to Bond's plans. Moreover, Bond's plans required some additional foundations.

On March 31, 1966, Plaza Inn entered into a contract with Allen Brothers and O'Hara, Inc. of Memphis, Tenn., for the construction of the superstructure of the hotel in conformity with the Bond plans, drawings, and specifications for a contract sum of $2,562,296.32. During 1966 and 1967 Allen Brothers and O'Hara, Inc., acting as contractors, constructed such superstructure. Because of a savings clause in the contract the superstructure ultimately cost Plaza Inn approximately $67,000 less than the contract price.

In October 1966, the Smith-St. John Manufacturing Co., a corporation with offices in Kansas City, Mo., was retained to work with Bond in connection with the functional aspects of the design of the kitchens and food operations and the designing of the decor and furnishings of the interior of the hotel. Turnbull-Novak, Inc., was also retained to work on specific interior designs.

On or about April 26, 1966, Kornblath filed a civil action against PMI, Bluhm, and Aidner in the United States District Court for the Western District of Missouri, Western Division, seeking additional sums in the amount of $198,284.83 for architectural services rendered. In their answer the defendants denied that any sums were due and owing to Kornblath.

Between April 15, 1966, and December 31, 1966, Plaza Inn incurred and paid the following amounts in connection with the Kornblath lawsuit:

| Payee | Type of expenditure | Amount |
|---|---|---|
| Smith, Schwegler & Swartzman | Reimbursement of attorney travel expenses. | $945.48 |
| Horwath & Horwath | Accounting fees | 1,697.03 |
| Bluhmco | Reimbursement of Bluhm's travel expenses. | 461.81 |
| Kemp, Koontz, Claggett & Norquist. | Attorney fees | 2,350.00 |
| Total | | 5,454.32 |

On March 3, 1967, Integrated filed a civil action against PMI in the Circuit Court of Jackson County, Mo., seeking additional sums in the amount of $7,652.31 for design services rendered. By answer the defendant denied that any sums were due and owing to Integrated.

In April of 1968 the Integrated suit was settled and dismissed with prejudice in consideration of the payment of $2,500 to Integrated by Plaza Inn. In May 1968 the Kornblath suit was settled and dismissed with prejudice in consideration of the payment of $75,000 to Kornblath by Plaza Inn.

During the taxable years 1967 and 1968 Plaza Inn incurred legal fees in connection with the Kornblath and Integrated suits as follows:

| Law firm | 1967 | 1968 |
|---|---|---|
| Smith, Schwegler & Swartzman | $26,000.00 | $17,500 |
| Kemp, Koontz, Claggett & Norquist | 31,724.12 | 4,769 |
| Total | 57,724.12 | 22,269 |

On its partnership return for the taxable period ending December 31, 1966, Plaza Inn claimed a deduction for "Loss on abandonment of architectural plans and interior designs" in the amount of $160,429. This deduction was computed as follows:

| | |
|---|---|
| Costs incurred prior to 1966 in connection with Kornblath's development of architectural plans | $123,909.68 |
| Less: Amount allocated by Plaza Inn to the designing of the foundation and capitalized as such (5% of the $425,699.34 cost of constructing the foundation) | 21,284.97 |
| | 102,624.71 |

Add: Costs incurred prior to 1966 in connection with Integrated's development of the design of the kitchens and food operations and its planning of the decor and furnishings of the interior of the hotel _____ $57, 804. 00

Deduction claimed (before rounding off to the nearest dollar) _____ 160, 428. 71

The costs incurred by Plaza Inn during its taxable period ending December 31, 1966, and its taxable years 1967 and 1968 in preparing to defend and in settling the Kornblath and Integrated lawsuits were deducted in full, either as business expenses or as abandonment losses, on its partnership returns for those periods. Respondent in his statutory notices determined that all of the foregoing expenditures were capital expenditures, that there was no abandonment of a capital asset, and that the expenditures had to be capitalized rather than deducted currently. He therefore adjusted the ordinary income or loss of Plaza Inn for each of the 3 taxable periods or years and made the corresponding adjustments to the taxable income or loss reported by each of Plaza Inn's partners. Since each partner was a corporation which had validly elected to be taxed as a small business corporation under subchapter S, the respondent also recomputed the distributive shares of each corporation's taxable income or loss reportable by those shareholders who are the petitioners herein.

### OPINION

Plaza Inn and its predecessors PMI and Agency undertook the development of a hotel. They hired Kornblath,[3] a firm of architects, to design the entire building. In order to fulfill a loan commitment, construction of the foundation pursuant to Kornblath's plans commenced prior to finalization of the plans for the superstructure of the hotel. When the plans were completed, bids for construction of the superstructure were far in excess of the anticipated costs. Kornblath was not able to modify its plans to lower the costs significantly. As a result another architect was sought. After terminating Kornblath, Bond, a second firm of architects, designed a new superstructure which was accepted and constructed. As completed the hotel consisted of a foundation designed primarily by Kornblath and a superstructure designed primarily by Bond.[4]

During the years in issue the petitioners deducted all the expenses, except those they directly allocated to the foundation, related to the

---

[3] Petitioners and respondent have both indicated that Integrated, the first interior designers, were so closely tied to Kornblath's plans, that they should be treated similarly.
[4] Bond made certain changes in the existing foundation to accommodate the new superstructure. The new superstructure however had certain features as contemplated by Kornblath dictated by the very nature of the already constructed foundation.

architectural and interior design plans of Kornblath and Integrated as abandonment losses.

Normally amounts paid to architects represent capital expenditures and are nondeductible except as provided in section 167. Sec. 263(a)-(1); sec. 1.263(a)-2(d), Income Tax Regs. Section 165(a) permits a deduction for any loss sustained during the taxable year which is not compensated for by insurance or otherwise. Such a loss may occur on the abandonment of property, whether depreciable or nondepreciable. Sec. 1.165-2(c), Income Tax Regs.; sec. 1.167(a)-8, Income Tax Regs.; *Coors Porcelain Co.*, 52 T.C. 682 (1969). Abandonment constitutes not merely shrinkage in value but the complete elimination of all value in an asset, and the recognition by the owner that the asset is of no utility to him. *Stanley Burke*, 32 T.C. 775, 780 (1959), affd. 283 F. 2d 487 (C.A. 9, 1960). It is then that the transaction is closed and the loss is properly deductible.

It has long been held that architects' fees may be deducted where the plans for a building are scrapped. *Tom (Fayette T.) Moore*, 19 B.T.A. 140 (1930); *Western Wheeled Scraper Co.*, 14 B.T.A. 496 (1928); *C. U. Connellee*, 4 B.T.A. 359 (1926). In *Robert Buedingen*, 6 B.T.A. 335 (1927), this Court upheld the deduction of an architect's fees where the building as designed was too expensive and was consequently rejected. This was so even though the same architect designed a second, albeit dissimilar, building which was eventually built.

Where the building was not completely abandoned, deductions have been denied for costs, including architect's fees, for portions of the building which were abandoned and redesigned. In *Driscoll v. Commissioner*, 147 F. 2d 493 (C.A. 5, 1945), affirming on this issue a Memorandum Opinion of this Court, the taxpayer had entered into contract for the construction of a hotel and office building. After work had been in progress for some time, the taxpayer determined to make some radical changes. As a result of an ineffective air-conditioning system, it was necessary to tear out or demolish much equipment and material and enlarge the building. In denying the taxpayer a deduction for the abandonment of the original materials and architectural fees, the Court of Appeals stated (p. 494):

We agree with the Tax Court in its conclusion that taxpayer was not entitled to deduct as an expense the items claimed as losses wrought by changes in connection with the construction of the hotel, and that cost of changes in design made before or during construction, whether these changes are necessitated because of mistake or otherwise, are but a part of the cost of the structure as finally completed. Extra expenses due to errors in plan and design are a part of the cost that the building traffic must bear. As the Tax Court well said: "The acceptance of petitioner's theory would result in a deductible loss in

practically every construction project. Common experience tells us that no construction job is carried out with such perfection that some material, because of error, mistake, or even slight change in design, is not removed and therefore does not remain a part of the completed structure. Such expenditures are, we think, clearly a cost of construction."

See also *Wah Chang Smelting & Refining Co. of America, Inc.*, 30 T.C. 838 (1958).

In the present case there is no dispute that the foundation, as designed by Kornblath, is a significant part of the hotel as built. Thus, we find these facts posited somewhere between those present in *Robert Buedingen, supra*, and in *Driscoll* v. *Commissioner, supra*. While perhaps not entirely free from doubt, we believe *Driscoll* to be the more analogous case. We believe that the efforts of Kornblath, commencing with the preliminary drawings, continuing with his endeavors to have the property rezoned, and his final plans and specifications were an integral and inseparable part of the cost of the hotel as finally constructed. There was one ongoing project and his efforts played a vital part in the early stages of what became a successful enterprise.

Petitioner argues that the Kornblath plans for the foundation and the superstructure were, to the contrary, separable and constituted two distinct assets. They rely primarily on *Sibley, Lindsay & Curr Co.*, 15 T.C. 106 (1950), where this Court granted a deduction to a corporation for two-thirds of the expenses incurred in hiring a group to study its capital structure and to make recommendations for improvement. The group offered three recommendations, all of which could have been accepted. The corporation accepted only one. Relying on *Robert Buedingen, supra*, each recommendation was treated as separate and distinct since any or all of the suggestions could have been instituted. See also *L. B. Maytag*, 32 T.C. 270 (1959) ; *Dresser Manufacturing Co.*, 40 B.T.A. 341 (1939) ; *Portland Furniture Manufacturing Co.*, 30 B.T.A. 878 (1934). Compare *Arthur T. Galt*, 19 T.C. 892, 911 (1953).

Whether something constitutes one or several assets is basically a question of fact. In *Sibley, Lindsay & Curr Co.*, this Court determined that each recommendation had a separate vitality. We do not believe this to be the case with the Kornblath plans. Kornblath was hired, as evidenced by its contract, to design the *entire* building. Moreover there is nothing in the record, other than the construction deadlines, which indicates that there was ever any intention to design a foundation separate and apart from the superstructure. On the contrary, because of the design of the foundation, the superstructure designed by Bond had much in common with Kornblath's original design. We are not presented with a situation where two separate and distinct plans existed as in *Buedingen*. Rather, as is logical, Kornblath de-

signed one set of plans, part of which was used and part of which, due to excessive costs, was rejected. While it is true that a fairly high percentage of Kornblath's work was abandoned, it does not alter the demonstrable fact that a significant amount of his work was used, and indeed supported the remaining part of the hotel. As such, his fees and those of Integrated must be capitalized as part of the cost of erecting the building.

Because of our decision, it is not necessary to reach the issue of when the abandonment took place.

> *Decisions will be entered for the respondent in docket Nos. 8111–71 and 8112–71.*
>
> *Decisions will be entered under Rule 155 in docket Nos. 4365–71, 4366–71, 4461–71, 8127–71, and 3238–72.*