MORRIS W. FINLEY and HELEN H. FINLEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Finley v. Commissioner
Docket No. 7307-72.
United States Tax Court
T.C. Memo 1974-229; 1974 Tax Ct. Memo LEXIS 92; 33 T.C.M. (CCH) 1012; T.C.M. (RIA) 74229; August 29, 1974, Filed. *92 Held, petitioners failed to prove that their loss on abandonment of a real estate project occurred in 1967. Morris W. Finley, pro se. Jonathan Brod, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies in petitioners' income taxes for the years 1964, 1966, and 1967 in the amounts of $21,703.28, $1,216.15, and $776.05, respectively. The parties have agreed on all issues except one. Petitioners claimed an ordinary loss deduction on their tax return for 1967 resulting from abandonment of a land development project in which they were involved. Respondent agrees, and the parties have stipulated, that petitioners suffered a loss in the amount of $79,202.96 on the project *93 and that it is deductible as an ordinary loss but respondent determined that the loss did not occur in 1967. [1] Thus the only issue for our decision is whether the abandonment loss occurred in 1967. The year of the loss is important because petitioners had a large taxable income in 1964 which could be offset by a loss carried back from 1967, but a loss from 1968 would not be carried back to 1964. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners, Morris W. Finley and Helen H. Finley, were husband and wife and resided in San Gabriel, Cal., at the time they filed their petition herein. Petitioners timely filed their joint Federal income tax returns for the years 1964, 1966, and 1967, with the district director of internal revenue at Los Angeles, Cal. Morris W. Finley (hereinafter petitioner or Finley) is a licensed surveyor. He is a shareholder in a land-engineering company that provides services to tract developers and builders, such as formulating plans for land grading, lot spacing, and offsite improvement work. *94 Prior to 1959, Finley had engaged in several real estate development ventures himself. During 1959 and continuing through 1963, Finley and Bernard Haber joined together for the purpose of the acquisition and sale of property located in Laguna Beach, Cal. Haber was a principal executive officer in North American Aviation Co. The Laguna Beach venture was the first real estate investment made by Haber and in this transaction, he mainly provided the necessary capital. Haber's primary employment left him little time for other business activities. The Laguna Beach property was sold at a substantial gain in 1963, a considerable portion of petitioner's share of the gain being taxable on the installment basis in 1964. During 1962, Finley also became involved in a land project in Marin County In Northern California, near the city of Novato. The Novato land was approximately 900 acres and contained a series of isthmuses projecting into water passages that had been opened up by diking the Petaluma River. Finley developed plans for a "waterpark" type of residential area from this Novato land. These plans created certain residential lots which were designed so that each lot would have *95 its own boat wharf with access to the San Pablo Bay and ultimately to the Pacific Ocean. Finley prepared extensive preliminary plot maps for the 900 acres. In these maps, he designated the future sites for stores, waterways, residences, schools, parks, shopping centers, multi-family dwelling areas, and clubs. The City of Novato Planning Commission gave tentative approval for the 900-acre project. Finley purchased 100 acres of the land outright and entered into option agreements for the purchase of the remaining 800 acres. Finley, as his next step in this land development project, incorporated Bahia Properties Corporation (hereinafter Bahia). He transferred the 100 acres of land which he had purchased to the corporation for the corporate stock. During the summer of 1963 Finley's financial backers withdrew from this venture. Haber decided to join the venture and participate on a financial and consulting basis. Thereafter, Haber began advancing money to Bahia for development purposes. Haber eventually owned 47-1/2 percent of the stock of Bahia, with Finley owning 52-1/2 percent. Haber and Finley obtained loans from the North American Aviation Credit Union to meet the option *96 payment schedule pending negotiations for a construction loan. Finley filed the tentative subdivision plot maps for the entire 900 acres in order to obtain financing and to obtain tentative approval from the Novato Planning Commission. He completed detailed plans and specifications for the first 396 lots, which comprised approximately 200 acres. Finley, through the vehicle of Bahia, intended to subdivide and develop this land and then sell the building lots to builders who would erect houses to be sold to the public. Finley and Haber exercised some of the options to acquire additional land and obtained extensions of the other options. Title to the first 396 lots was transferred to Bahia, which handled the financing and construction. Title to the options to purchase the remaining 700 acres was retained by Finley and Haber; however, they intended to eventually sell this acreage to Bahia for development. Engineering designs for the excavating, lot grading, water supply, sewers, stormdrains, curbs, gutters, sidewalks, street paving, access and other offsite improvements, public utility hookups, and construction of a sewage plant, were completed. Finley obtained for Bahia a contract *97 with a builder, Brown and Kauffman, under which the builder agreed to purchase the building sites when prepared, with takeout financing from Wells Fargo Bank, and to construct houses thereon for sale to the public. On June 8, 1965, Bahia obtained a construction loan from Union Bank, a California corporation, for $3,500,000 to make the necessary developmental improvements. The loan agreement was executed by Bahia, as borrower, and Finley and Haber, and their respective spouses, signed it as guarantors. The loan was secured by a deed of trust on the property. Repayments on the loan were due upon, and coordinated with, payments to be made by Brown and Kauffman under its purchase agreement with Bahia. The first 100 lots were completed by Bahia and were ready for delivery to Brown and Kauffman in early 1966. Brown and Kauffman, because of the tight money market and its own financial position, defaulted and refused tender of these 100 lots. Both the Wells Fargo Bank and Union Bank refused to provide takeout financing. As a consequence of Brown and Kauffman's failure to honor its contractual commitment, Bahia did not obtain the necessary funds to make the payments on its construction *98 loan from Union Bank when due. As a result, this loan fell into default. Finley and Haber persuaded Union Bank to give them an extension to December 1966 to find a new buyer for the completed lots. During this period, the work on the other 296 lots continued. Finley and Haber made extensive efforts to find another builder who would be willing to complete the project; however, due to the tight money market and the adverse effect it had on real estate construction, they could not find a builder with adequate resources and financing who was interested in completing the project. In late 1966 and early 1967, the Bank Commissioner of California put pressure on Union Bank to extricate itself from its commitment. Since the date of the default on the loan payments, no principal or interest payments had been made. Finley was able to delay foreclosure for an extended time while he continued his search for a new buyer for the property. He achieved this by demonstrating to Union Bank that due to the poor real estate market, the bank would have great difficulty in obtaining a buyer if it decided to foreclose. On April 19, 1967, all the contractors involved in the improvement of the *99 subdivision were told to discontinue work and that all further work would be authorized by Union Bank. On July 24, 1967, Union Bank filed notices of default with the Marin County Clerk. A meeting between Finley and Haber and Union Bank was subsequently held on October 12, 1967. In this meeting, both parties indicated that they wished to avoid a foreclosure and deficiency judgments against Finley and Haber. The parties agreed to work together to reach a compromise on the matter and the bank agreed to talk to any possible buyer that Finley and Haber would bring to the bank. In early 1967, Finley's financial situation became precarious and he had to refinance a mortgage on his home to obtain funds with which to live. In about March of 1967 he advised Union Bank of his situation and the bank made arrangements to advance funds to Finley each month to pay his living expenses. The bank was anxious to have Finley stay with the development project to complete certain phases of it. The bank ceased making these payments on August 8, 1967. Haber and Finley, through their attorney, Leo Andrade, Jr., held extensive and prolonged negotiations with the bank throughout the latter part *100 of 1967 and early 1968 in efforts to work out some agreeable solution to the situation. During these discussions the primary concern of Finley, Haber, and Bahia centered on the retention of certain utility deposit contracts and the release by the bank of Finley's and Haber's personal guarantees on the loan to Bahia. Bahia wanted to retain the utility deposit contracts and the refund rights thereunder because these refund contracts had been previously assigned to one of the creditors of Bahia for legal services rendered. At one point in 1967 in these negotiations Finley and Haber offered to give the bank a deed to the property in lieu of foreclosure but the bank refused it because it could not be assured that this would give it title to the property free of other encumbrances. In the latter part of 1967, Union Bank believed that it would incur a loss on this project of between $500,000 to $1 million; this loss expectation was disclosed to Finley, Haber, and their attorney on December 8, 1967, by one Joseph DeLucca, a representative of Union Bank. The loss on the note would have generated a deficiency judgment against Finley and Haber as guarantors. Finley did not have the financial *101 resources to pay a deficiency judgment of this magnitude. Consequently, Finley and Bahia were considering filing petitions in bankruptcy in the event they failed to reach an amicable settlement with the bank which would include the release of Finley as a personal guarantor of the loan. Possible bankruptcy proceedings by Finley and Bahia could have tied up the property and the project and placed the bank in a situation from which it would have been much more difficult to extricate itself. As a result, there existed substantial motivation for the bank to arrive at a settlement which would remove this possibility of bankruptcy. The bank was also interested in obtaining Bahia's rights under the Brown and Kauffman contracts and, of course, Finley was anxious to avoid the stigma of bankruptcy, so the parties continued to try to work out an agreement to avoid foreclosure by the bank. The philosophy of the bank was that it entered into this venture in order to lend money and collect interest on this loan; its purpose was not to acquire and develop real estate. Instead of exercising its right of foreclosure, Union Bank believed it would be more advantageous to it if Finley sold the property *102 and, therefore, it actually encouraged him to try to find a buyer. On December 18, 1967, John T. Pool, Jr., an economist working in the real estate loan department of Union Bank, who was assigned the responsibility of working out this loan, submitted Finance Plans 1 and 2 which were basically alternate methods for securing the bank's interest in the project. Finance Plan 1 provided: Bank will cause Bahia Properties Corporation, Finley, Haber, et al, to sell all fee and option interests to a developer-builder for cash. * * * B. All such cash will be applied to Bank loan. Finance Plan 2 was a plan for development and sale of the project by the bank if Finance Plan 1 failed and the bank foreclosed on the property. The bank adopted Finance Plan 1 until January 15, 1968. The title to the Novato real estate remained in the Finley group (Finley, Haber, and Bahia) throughout this entire period. Any sale of the property or project prior to foreclosure by the bank would have to be by the Finley group. While Finley was advised of this by his attorney, he was also advised that it would be in his best interest and in the best interest of Bahia to cooperate with Union Bank to *103 minimize any potential loss and to facilitate the negotiations aimed at an eventual settlement.
Finley made continuous and extensive efforts to find a buyer for the project until the foreclosure sale was held in March 1968. He told certain officials in Union Bank within a month of the bank's foreclosure in March 1968 that he had clients who were going to offer $5 million in cash for the project and that he was negotiating further with these people. A sale at that price would have more than covered all obligations against the project. Also, sometime prior to February 6, 1968, Finley told John Pool, Jr., an official at Union Bank, that he was negotiating with a real estate company, Grubb and Ellis, for a potential buyer of the property. Pool indicated to Finley that the bank was ready to advertise the property for a foreclosure sale; however, he would try to postpone this advertisement if Ellis called him to explain Grubb and Ellis' interest in the project. On February 13 or 14, 1968, Pool met with Finley, Grubb and Ellis, and Grubb and Ellis' client, Boyd Stevens, in the San Francisco area. Finley had initiated this meeting. Pool attended the meeting because Finley claimed that *104 the Grubb and Ellis client was interested in the project. However, it turned out that Boyd Stevens did not want to put up any money but was interested in building some houses if Union Bank would finance the construction. Pool found this proposal totally unacceptable and stated that the bank would not consent to such a proposal. Although rather extensive efforts were being made by a number of people, including Finley, Union Bank, and a real estate broker named Ned Weed, to find a buyer for the Novato realty, these endeavors proved to be entirely fruitless. Finally, on March 1, 1968, an agreement was signed which settled the rights and liabilities of the parties. It provided that Finley, Haber, their wives, and Bahia would relinquish all rights in the project in exchange for the bank's release of Finley's and Haber's personal guarantees of the construction loan and the rights under the utility deposit contracts. As a result of the agreement, the bank also received all rights under the Brown and Kauffman agreement. On March 4, 1968, the bank filed notice of public sale. On March 11, 1968, the bank foreclosed the properties. After foreclosure, the bank eventually sold the *105 project in 1968 or 1969 for approximately $5 million. In preparation for the sale of the project, the bank adopted a scheme originated by Pool which changed the project plans and the philosophy of the development of the Novato real estate. Pool was of the opinion that if the project plans were changed the property could be sold at a substantial profit. This new plan required the investment of additional funds by Union Bank. [2]
As a result of the bank's foreclosure on the property and the overall failure of the project, petitioner suffered a loss in the amount of $79,202.96. While it is not entirely clear from the record just what the loss involved it apparently resulted primarily from cash advances made by Finley for the purchase of properties and the payment of engineering bills. All of the advances and payments were made prior to the end of December 31, 1967. In any event the parties have stipulated that *106 Finley suffered a loss in that amount which is deductible as an ordinary loss under section 165, I.R.C. 1954. The only issue is the year in which the loss was incurred. We assume that if the loss cannot be absorbed by 1964 income it will be available for offset against 1966 and 1967 income, and that this and other adjustments agreed to by the parties will be reflected in the Rule 155 computations. ULTIMATE FINDING OF FACT The loss suffered by petitioners on the Novato real estate development project was not incurred in 1967. OPINION Petitioners claim they suffered the loss on the Navato real estate development project in 1967 when it became obvious that they could not complete the project and they abandoned it. Section 165, I.R.C. 1954, [3] provides, in pertinent part: (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. To be allowed as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events and *107 actually sustained during the taxable year. Sec. 1.165-1(b), Income Tax Regs.; Boehm v. Commissioner, 326 U.S. 287 (1945). Additionally, section 1.165-1(d) (1), Income Tax Regs., provides: A loss shall be allowed as a deduction under section 165(a) only for the taxable year in which the loss is sustained. For this purpose, a loss shall be treated as sustained during the taxable year in which the loss occurs as evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year * * *. A loss deductible under section 165(a) may occur on the abandonment of property. Robert B. Haspel, 62 T.C. 59 (1974). Section 1.165-2(a), Income Tax Regs., states: A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a) for the taxable year in which the loss is actually sustained. For this purpose, the taxable *108 year in which the loss is sustained is not necessarily the necessarily the taxable year in which the overt act of abandonment, or the loss of title to the property, occurs. This Court has stated that to claim an abandonment loss, the taxpayer must demonstrate an intention "to abandon the property, coupled with an act of abandonment, both of which must be ascertained from all the surrounding facts and circumstances." Boston Elevated Railway Co., 16 T.C. 1084, 1108 (1951), affd. 196 F.2d 923 (C.A. 1, 1952); accord, Massey-Ferguson, Inc., 59 T.C. 220 (1972).
A clear pronouncement of the requirements to establish an abandonment loss was enunciated by the court in Commissioner v. McCarthy, 129 F.2d 84 (C.A. 7, 1942): The rule to be deduced from the "abandonment" cases, we think, is that a deduction should be permitted where there is not merely a shrinkage of value, but instead, a complete elimination of all value, and the recognition by the owner that his property no longer has any utility or worth to him, by means of a specific act proving his abandonment of all interest in it, which act of abandonment must take place in the year *109 in which the value has actually been extinguished. This rule has been accepted by this Court. Robert B. Haspel, supra; Stanley Burke, 32 T.C. 775 (1959), affd. 283 F.2d 487 (C.A. 9, 1960). Once the abandonment requirements have been met the transaction is closed and the loss is properly deductible. Robert B. Haspel, supra.
The question of the year in which an abandonment loss is sustained is basically factual, Burke v. Commissioner, 283 F.2d 487 (C.A. 9, 1960), and must be ascertained from all the pertinent facts and circumstances. Boston Elevated Railway Co., supra.The taxpayers have the burden of proving that the loss occurred in the year in which the deduction is claimed, Boehm v. Commissioner, supra.In this case we rather reluctantly conclude that the taxpayers have failed to carry the burden of proving that the loss occurred in 1967. We are highly sympathetic to the predicament in which Finley was placed when Brown and Kauffman defaulted on their building contract and when his entire project collapsed. However, from the evidence produced at trial, we cannot find that there *110 was either a complete elimination of all value of the project to Finley by the end of 1967; or that he actually abandoned the project in 1967. We have recounted in considerable detail in our findings of fact the efforts made by all parties concerned, and the negotiations that continued almost up to the time of the foreclosure sale by the bank which would result in the bank having to take over the project itself. We think the facts so found from the evidence presented speak pretty much for themselves to indicate that Finley did not completely abandon the project in 1967, and it would serve no useful purpose to discuss them in detail here. We recognize that the default by Brown and Kauffman left the project, and indeed Finley himself, in a precarious financial situation in early 1967, and that Finley stated to several people that unless he could find some help he would have to abandon the project. However, a mere intention to abandon is not enough. This intention must be carried into effect and must be evidenced by some specific act or acts. Helvering v. Jones, 120 F.2d 828, certiorari denied 314 U.S. 661; Ersel H. Beus, 28 T.C. 1133, *111 affd. 261 F.2d 176. Indeed, the actions of both Finley and the bank throughout the year 1967 and up until the foreclosure sale in March of 1968 refute the idea that Finley had actually abandoned the project or that the bank wanted him to do so. Finley asked the bank for and was given lengthy extensions of time after the Bahia loan was in default to try to rescue the project or sell it. The bank was even willing to advance Finley funds to live on until it finally decided it should advertise the sale. This occurred in about August of 1967, but the evidence is clear that compatible negotiations continued long after that and that the bank did not actually proceed with foreclosure until 1968. The Finley group had much to gain by forestalling a foreclosure by the bank. It is obvious from the evidence that Finley's hopes of selling the project at a profit were up and down during the latter part of 1967 and the early part of 1968; but there is no evidence that he gave up all hopes in 1967. The evidence indicates that he contacted at least two possible potential buyers in 1968 and that at least one of them considered paying a price that would have paid all obligations *112 of the project and left a profit. Perhaps Finley was living proof of the adage that "hope springs eternal" but it is clear from the record that he was not a quitter and did not give up until all hope was eliminated and the settlement agreement was signed on March 1, 1968. Furthermore, the former Union Bank officers who were involved in this project testified that the bank did not want to take over the project and would have stopped the foreclosure sale at any time prior to the drop of the hammer if Finley had come up with a reasonable offer from a responsible purchaser, and that the bank was only interested in extricating itself from the embarrassment this loan had caused it, and not in making a profit on a possible sale of the project. The Finley group also believed they had something to bargain with during the negotiations prior to the sale. They held title to the property and the bank could not sell it without foreclosure. The utility deposits had a value, and the fact that they had been assigned to the group's attorneys did not reduce their value. The right to sue Brown and Kauffman for default on its agreement was apparently thought to have an intangible, although probably *113 unknown, value by both Finley and the bank. While it appears from the evidence that sometime during the latter part of 1967 Finley offered to give the bank a deed in lieu of foreclosure, it was not shown what the complete terms of such offer were, and we are doubtful from what transpired later that Finley would have given the deed without reserving the right to the utility deposits and obtaining a release of the personal liability of both Finley and Haber as guarantors of the loan. And, in fact, in the final statement agreement entered into just prior to the foreclosure, Finley and Haber were released from all personal liability and they retained the utility deposits for the benefit of their assignees. Furthermore, there were no outward signs or acts on the part of Finley that evidenced an actual abandonment of the project in 1967. He never indicated that he was simply walking away from the project and letting the chips falls where they may - including the loss of the utility deposits and the rights under the Brown and Kauffman agreement, and leaving himself personally liable for a deficiency judgment in the event a foreclosure sale did not produce enough to pay the bank loan *114 in full. Nor did Finley allege or establish any other identifiable event in 1967 which evidenced a closed and completed transaction thereby establishing a loss. Sec. 1.165-1(b), Income Tax Regs. To the contrary his outward actions indicated a determination to stay with the project as long as he could with the hope that it could be salvaged for the benefit of both himself and his benefactors. Perhaps it is unfortunate that Mr. Finley had the admirable quality of not walking out on a project when the going got rough and leaving others to mitigate their losses as best they could, because it apparently will work to his misfortune here, but the fact remains that petitioners have not shown that they incurred an abandonment loss in 1967 under the requirements of the regulations and the law. We therefore decide this issue for respondent. The effect of this decision on petitioners' tax liabilities for each of the years 1964, 1966, and 1967 should be reflected by the parties in their Rule 155 computations. Decision will be entered under Rule 155. Footnotes
1. Respondent argues that the loss did not occur until 1968 when the real estate was sold in a foreclosure sale. ↩
2. There is no evidence to indicate whether the bank actually sold the project for a profit. The bank initially invested well over $3 million in the project. Pool claims it also invested another couple of million dollars but he failed to specify the exact amount. ↩
3. All section references are to the Internal Revenue Code of 1954 unless otherwise indicated. ↩